RENDERED: FEBRUARY 10, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0338-MR

BERNARD TEW, PH.D.; ANDREA
TEW; STEPHANIE TEW; AND
VINCENT TEW                                                    APPELLANTS

                    APPEAL FROM WOODFORD CIRCUIT COURT
v.                  HONORABLE BRIAN PRIVETT, JUDGE
                    ACTION NO. 20-CI-00066

KENTUCKY FARM BUREAU
MUTUAL INSURANCE COMPANY;
AND ACUITY, A MUTUAL
INSURANCE COMPANY                                              APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, JONES, AND McNEILL, JUDGES.

CETRULO, JUDGE: This is an appeal from summary judgments granted in favor

of two insurers. The trial court ruled that there was no duty to defend nor any

obligation to indemnify the appellants under any of the applicable insurance

policies. Because the facts are somewhat convoluted, we begin there.

Dr. Bernard Tew and his wife, Andrea, ("the Tews") ran a small investment management limited liability company, Bluegrass Investment Management Company ("Bluegrass"), which they started to provide financial services for several retirement funds for businesses owned by George Hofmeister. Through a rather complex investment strategy called dividend arbitrage, the Tews[1] associated with a London-based investment banker, ED&F Man Capital Markets Limited ("ED&F"), to purchase shares of stock in European businesses just prior to the stock's dividend payment. After the dividend was paid to retirement fund accounts, the shares were promptly sold.

Pursuant to Danish law, the Customs and Tax Administration of Denmark ("SKAT") withholds a 27% tax on dividend payments made to retirement fund accounts. Tax treaties between the United States and Denmark allowed those U.S. funds to obtain a tax refund of any dividend tax withheld. To obtain those tax refunds, documentation had to be provided to SKAT. The Tews, as U.S.-based fiduciaries of the retirement funds, provided Internal Revenue Service ("IRS") forms and power of attorney forms to the payment agent in Europe. SKAT then approved the refund request and paid the dividend tax refunds into the retirement accounts.

---

[1] Andrea Tew, Vincent Tew, and Stephanie Tew Campbell, children of the Tews, moved to intervene in this suit as fiduciaries of three separate retirement accounts. While there are some separate issues as to their potential coverage, we will simply refer to all appellants as the Tews.

However, in 2015, SKAT discovered that the tax refund requests it processed and paid to numerous U.S. retirement funds exceeded the amount of taxes that had actually been withheld. SKAT contends that it transferred billions of Danish Kroner (Danish currency) to accounts that were not entitled to receive them. The Tews claim that the retirement fund accounts were being manipulated fraudulently by insiders at ED&F.

Regardless of whether the Tews had knowledge of those actions, they were sued along with others in 15 complaints filed by the Kingdom of Denmark. Those actions were heard in the United States District Court for the Eastern District of Kentucky. In short, the suits alleged that the Tews had negligently misrepresented facts and provided inaccurate information and misrepresentations to SKAT to process a tax refund claim, which SKAT relied upon, and made corresponding payments into the Tews' retirement accounts/entities.[2]

The Tews initially sought bankruptcy protection as a result of the SKAT litigation and reached a confidential agreement with SKAT as part of the bankruptcy proceedings. Thereafter, the Tews filed this action in Woodford Circuit Court, seeking a declaratory judgment that Acuity, a Mutual Insurance Company ("ACUITY") and Kentucky Farm Bureau ("KFB") had a duty to defend

---

[2] Although there were also allegations of fraud, here, the parties agree that there would be no coverage under any policy for those claims.

the Tews against SKAT's allegations and that one or both of them were liable for the damages that were being sought against the Tews. This leads us to a discussion of the policies alleged to be in effect at the time of those allegations.

## I. The Acuity Policy

ACUITY issued a commercial general liability policy to Bluegrass, which was in effect from January of 2013 until January of 2014 ("Acuity Policy"). The parties agree that Bernard and Andrea Tew were the named members and only employees of the named insured, Bluegrass. That policy provided that

> 1. If you are designated in the Declarations as:
>
> . . . .
>
> > c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.
>
> . . . .

The parties agree that the policy and/or its endorsements clearly define the scope of "property damage" and "occurrence," as follows:

> 1. Insuring Agreement
>
> > a. We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . *property damage* to which this insurance applies. We will have the right and duty to defend the insured against any suit

-4-

seeking those damages.  However, we will have no duty to defend the insured against any suit seeking damages for . . . property damage to which this insurance does not apply. . . .

    b. This insurance applies to bodily injury and property damage only if:

      (1) The bodily injury or property damage is caused by an occurrence that takes place in the coverage territory;

      (2) The bodily injury or property damage occurs during the policy period, . . . .

(Emphasis added.)

The Acuity Policy defined the following terms:

17.  "Property Damage" means:

. . .

    b.  Loss of use of *tangible property* that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "*occurrence*" that caused it. . . .

18.  "Suit" means a civil proceeding in which damage because of . . . [property damage] to which this insurance applied is alleged. . . .

(Emphasis added.)

Further, it defined "occurrence" in the base policy using an

Amendatory Endorsement Form No IL – 7092(2-11), which provided, in pertinent

part:

-5-

Occurrence means an accident, including continuous or repeated exposure to the same general harmful conditions. Occurrence includes:

. . .

B. Property damage to property other than your work that arises out of your work. . . . ROA 2240-2265.

The Tews contend that ACUITY had a duty to defend them in relation to the complaints filed by SKAT in the United States District Court for the Eastern District of Kentucky. They assert that the foregoing definition of "occurrence" provides coverage for accidental conduct and that there is at least one allegation in the SKAT complaints that the Tews did something accidentally, resulting in property damage. ACUITY contends the conduct of the Tews was not covered under the terms of the policy and does not constitute an "occurrence" as defined in the Acuity Policy. ACUITY further contends that the loss of use of money asserted in the SKAT complaints does not constitute "property damage" caused by an occurrence.

## II. The Kentucky Farm Bureau Policies

The trial court initially found that the only possible effective policy that KFB had issued to the Tews at the time of the loss was a farm policy on property owned in Lyon County, Kentucky. The order specifically stated that at the time of the losses claimed by SKAT, the Tews resided in Woodford County

and had separate liability coverage on that residence with a different carrier. The trial court held there was no coverage owed nor any duty to defend under that farm policy.

The Tews' briefs, however, make no reference to the farm policy and instead address only purported claims under a KFB homeowner's policy, first issued to the Tews in October 2018 to cover their Woodford County home ("KFB Homeowner's Policy"). We are "without authority to review issues not raised in or decided by the trial court." *Util. Mgmt. Grp., LLC v. Pike Cnty. Fiscal Ct.*, 531 S.W.3d 3, 13 n.8 (Ky. 2017) (citing *Ten Broeck DuPont, Inc. v. Brooks*, 283 S.W.3d 705, 734 (Ky. 2009)). While the trial court did find that there was no duty to defend nor any coverage owed under any policy issued by KFB, we will review only the applicability of the KFB Homeowner's Policy as that is the only argument the Tews raise here.

> The KFB Homeowner's Policy defines the following terms:
>
> An "occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in: .
> . . .
>
> > 6. "Property damage" means physical injury to, destruction of, or loss of use of *tangible property*.

(Emphasis added.)

Section II of the KFB Homeowner's Policy provided liability coverage, and Coverage E provided personal liability coverage. The insuring agreement provides:

> SECTION 11 – LIABILITY COVERAGES
> COVERAGE E – Personal Liability
>
> If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:
>
> 1. Pay up to our limits of liability for damages for which the "insured" is legally liable. Damages include pre-judgment interest awarded against the "insured"; and
>
> 2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the "occurrences" equals our limit of liability.

The Tews maintain that they were insureds, as named individuals residing in the residence, along with their son, who still lives in the residence. They also assert that one of their daughters resided there during the period that the transactions at issue were ongoing and could also qualify under the definitions. They asserted that the KFB Homeowner's Policy language does not limit coverage in terms of the date the suit was filed or when the accidental occurrence happened. It was further their position that the KFB Homeowner's Policy definition of

"occurrence" does not require the "accident" to occur during the policy period, but requires only the "property damage" *caused by the accident* to result during the policy period.

As they claimed in regard to ACUITY, the Tews argue that the allegations of five of the SKAT complaints, *i.e.*, of negligent misrepresentation resulting in a loss of use of tangible property, are sufficient to require KFB to defend them. KFB maintains that the KFB Homeowner's Policy defines an "occurrence" as an accident that results *during the policy period* in property damage that *must occur during the policy period*. KFB further maintains that the transactions at issue took place years before the policy was effective. Finally, KFB asserts that none of the allegations involve an "occurrence" or "accident" as those terms are defined. The parties agree that the "occurrence," "accident," or "property damage," if applicable at all, was the loss of Danish Kroner alleged by SKAT, which took place in 2013 to 2014 and was discovered by the Danish tax authority in 2015. KFB also asserts that even if there were any coverage afforded under any of the policies, it is specifically excluded by multiple exclusions within each of the policies.

**STANDARD OF REVIEW**

When a trial court grants summary judgment in a declaratory judgment action with no bench trial, as it did here, "we use the appellate standard

of review for summary judgments." *Foreman v. Auto Club Prop.-Cas. Ins. Co.*, 617 S.W.3d 345, 349 (Ky. 2021) (citation omitted). "Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue *de novo*." *Lewis v. B&R Corp.*, 56 S.W.3d 432, 436 (Ky. App. 2001) (citation omitted).

For insurance claims, specifically, the Kentucky Supreme Court has recently held:

> Foremost in interpreting an insurance contract we are bound by the specific language of the contract before us. We apply certain rules of construction to insurance contracts, including a rule that when the terms of an insurance contract are unambiguous and not unreasonable, they will be enforced as written. Unambiguously defined terms are "interpreted in the light of usage and understanding of the average person." Ambiguous terms and the language of exclusions are strictly construed against the insurer so as not to defeat the policyholder's reasonable expectation of coverage. But "this rule of strict construction certainly does not mean that every doubt must be resolved against the insurer and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the plain meaning in the contract."

*Foreman*, 617 S.W.3d at 349-50 (citations omitted).

-10-

# LEGAL ANALYSIS

Here, we must (1) determine whether the insurance providers were obligated to provide coverage, and therefore had a duty to defend the Tews; and (2) interpret the terms of the policies. We begin with the duty to defend.

The Kentucky Supreme Court outlined the basic duties of an insurance company to defend its insured in *James Graham Brown Foundation, Inc., v. St. Paul Marine & Fire Insurance Company*, 814 S.W.2d 273 (Ky. 1991). There, the Kentucky Supreme Court held that an "insurer has a duty to defend if there is any allegation which" could come within the coverage of the policy. *Id.* at 279 (citing *O'Bannon v. Aetna Cas. & Sur. Co.*, 678 S.W.2d 390 (Ky. 1984)). Under those circumstances, where the policy appears to provide coverage, the appropriate course of action for the insured is to commence a declaration of rights action. *See, e.g.*, *Thompson v. W. Am. Ins. Co.*, 839 S.W.2d 579 (Ky. App. 1992). In this case, the Tews commenced multiple actions to declare rights under various policies, but coverage must be found before there is a corresponding duty to defend any insured.

The Tews maintain that only a single allegation needs to fall within the scope of coverage for the duty to defend to kick in; therefore, they focus on the negligent misrepresentation allegations. They assert that such allegations involve the paperwork the Tews submitted, which resulted in the loss of use of a set

amount of Danish Kroner. Further, they claim that loss of use of money constituted loss of use of tangible property as defined by the KFB Homeowner's Policy. According to the Tews, the same allegations constitute an "occurrence resulting in property damage" under the Acuity Policy. Thus, they maintain that both carriers had a duty to defend under *Brown Foundation*.

However, the allegations in the complaint are not by themselves sufficient to create a duty if the terms of the policy do not potentially provide coverage. *Brown Found.*, 814 S.W.2d at 279. An insurer does not always have to "defend against a claim it believes falls outside the policy it issued." *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69, 79. (Ky. 2010). It is well established that terms of a policy must be given their plain meaning and enforced as drafted with a reasonable interpretation. *See St. Paul Fire & Marine Ins. Co. Powell-Walton-Milward, Inc*., 870 S.W.2d 223, 226 (Ky. 1994).

Thus, we must interpret the words and terms of the policies at issue. As delineated in the provisions of both policies, the coverage is generally available only if there is "property damage" caused by an "occurrence" to which coverage applies. In that instance alone, the insurers would have a duty to defend. This Court simply cannot agree that the SKAT complaints allege any cause of action that would constitute an "occurrence" under either of the policies.

First, the SKAT complaints allege that the Tews had a duty to provide accurate and complete information and that they materially misrepresented or misstated applications that they knew or should have known were inaccurate. The Tews argue that these are allegations of "accidental" conduct, not intentional conduct.

However, Kentucky courts have taken a narrow approach when defining "accidents." In *Stone v Kentucky Farm Bureau Mutual Insurance Company*, 34 S.W.3d 809, 812 (Ky. App. 2000), this Court stated that an accident is not something that results "from a plan, design, or an intent on the part of the insured." There must be some reasonable limitation and interpretation as to what constitutes an accident or occurrence. *See Cincinnati*, 306 S.W.3d 69. An "accident" is generally seen as a fortuitous event. *See id.* at 73-74. Because "accident" has not been given a technical meaning in the many cases interpreting insurance policies, the courts have given "accident" its plain meaning. *Id*. at 74 (citing *Fryman for Fryman v. Pilot Life Ins. Co.*, 704 S.W.2d 205 (Ky. 1986)).

Regardless of the degree to which the information provided or documents filed were scrutinized or assessed by the Tews in its preparation, there was no evidence suggesting it was an accident that it *was* provided and filed. What the Tews did in the early stages should be distinguished from what may have later come to light. In their brief, the Tews reference some information as what "[t]he

Tews learned, long after this litigation began." Specifically, the Tews maintain that they only learned afterward that large blocks of shares were being purchased by insiders at ED&F, who then fraudulently cycled those shares between multiple fund accounts on the dividend date and manipulated the accounts to hide this activity. Even if the Tews did not intend to participate in the fraudulent activity, they intended to execute the documents. The Tews may have later learned that the water in the SKAT *pool*, so to speak, was contaminated; however, it was no accident that they chose to dive into that pool in the beginning.

Secondly, the complaints by SKAT alleged loss of use of money due to this fraudulent tax scheme. In a creative discussion of fiat money and how Danish Kroner is not backed by gold or any commodity, the Tews assert that the monetary damages SKAT sought in its filings constituted loss of use of "tangible property," as defined by each of the policies.

This raises an interesting discussion as to whether money is tangible property. Several courts in other states have largely held that it is not.[3] We have not found, nor has any party referred us to, any Kentucky caselaw which directly addresses whether money constitutes tangible property. However, the federal

---

[3] *See, e.g.*, *Mack v. Nationwide Mut. Fire Ins. Co.*, 517 S.E.2d 839 (Ga. Ct. App. 1999); *Travelers Indem. Co. of Am. v. Jim Coleman Auto. of Columbia, LLC*, 236 F. Supp. 2d 513 (D. Md. 2002); *Snug Harbor, Ltd. v. Zurich Ins.*, 968 F.2d 538 (5th Cir. 1992); *Johnson v. Amica Mut. Ins. Co.*, 733 A.2d 977 (Me. 1999); *Walker v. State Farm Fire and Cas. Co.*, 569 N.W.2d 542 (Minn. Ct. App. 1997).

district court for the Eastern District of Kentucky, called to determine coverage and/or any duty to defend the Tews on a separate claim against a different insurance carrier, did a thorough analysis of this very argument. *Travelers Indem. Co. of Am. v. Tew*, No. 5:20-cv-292-JMH, 2021 WL 5380944, at *5 (E.D. Ky. Nov. 17, 2021).

Having reviewed these policies and briefs before us, we do not believe we could state our view any better than what was stated therein:

> [M]oney is not tangible property. Instead, money is intangible property, as it does nothing more than represent value while having no intrinsic value of its own. This is exemplified by the fact that money can be deposited and transferred electronically, which unquestionably makes money intangible. That money may also come in a physical form, such as a United States Dollar, or in this case, a Danish Kroner, is inconsequential regarding whether money is tangible property because the tangible embodiment of money can be converted to an inarguably intangible medium without losing its value, meaning the Danish Kroner itself is not what has value. Since money is not tangible property, there was no loss of tangible property triggering [the insurance company's] duty to defend and, thus, no breach of that duty entitling [the Tews] to either defense costs or damages.

*Travelers Indem. Co. of Am. v. Tew*, No. 21-6129, 2022 WL 3696676, at *1-2 (6th Cir. Aug. 26, 2022) (quoting *Travelers Indem. Co. of Am. v. Tew*, 2021 WL 5380944, at *5).

We agree and conclude that the damages alleged by SKAT did not implicate either of the policies, as there simply was no loss of tangible property. The alleged conversion of refunds in this case resulted in an intangible economic loss, rather than a loss of use of tangible property.

The insurers both make further arguments pertaining to the various exclusions from coverage under the respective policies. The Kentucky Supreme Court has held that if an event does not fall within the terms of the coverage, then there is no need to determine whether the exclusions apply because coverage is already denied. *Cincinnati*, 306 S.W.3d at 78 n.35 (Ky. 2010) (citation omitted) ("[A] court need not consider the applicability of an exclusion if there is no initial grant of coverage under the policy.").

The Tews make further arguments pertaining to the "occurrence" period of the KFB Homeowner's Policy and whether there would be any coverage owed if there was property damage that occurred during the policy period (even though that policy was not in effect until three years after the alleged acts). Having already concluded that the loss of money alleged by SKAT was not a loss of tangible property, so as to invoke property damage coverage, we need not address that argument either. As a matter of law, the policies did not cover the SKAT litigation and the insurance companies had no duty to defend or indemnify the Tews.

The trial court found the same.  Specifically, the court found no cause of action that would constitute an "occurrence" under either policy and found no "property damage" occurred, as defined in the Acuity Policy.  As to the KFB Homeowner's Policy, the loss of use of money would not constitute "damage to tangible property."  We hereby affirm the rulings of the Woodford Circuit Court, finding there was no disputed material issue of fact.  The Woodford Circuit Court properly granted summary judgment, finding the insurance companies' policies did not cover any portion of the SKAT litigation.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Justin S. Peterson
Kellie M. Collins
Taylor M. Shepherd
Lexington, Kentucky

BRIEF FOR APPELLEE ACUITY, A MUTUAL INSURANCE COMPANY:

Jason S. Morgan
Betsy R. Catron
Lexington, Kentucky

BRIEF FOR APPELLEE KENTUCKY FARM BUREAU MUTUAL INSURANCE COMPANY:

R. Craig Reinhardt
Lexington, Kentucky