RENDERED:  SEPTEMBER 4, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-001276-MR

DAVID W. ADAMS AND
BETTY ADAMS                                                         APPELLANTS


|  | APPEAL FROM OLDHAM CIRCUIT COURT |
| --- | --- |
| v. | HONORABLE KAREN A. CONRAD, JUDGE |
|  | ACTION NO. 16-CI-00355 |


CYNTHIA L. GREENE; JAMES
D. GREENE; COMMONWEALTH
OF KENTUCKY, FINANCE &
ADMINISTRATION CABINET;
INTERNAL REVENUE SERVICE;
BAYMONT FRANCHISING, LLC;
COOK & FRANK, SC;
COUNTY OF OLDHAM, KENTUCKY;
STOCKYARDS BANK & TRUST
COMPANY; AND AMOS W. ADAMS                             APPELLEES


OPINION
REVERSING

** ** ** ** **

BEFORE:  CALDWELL, DIXON, AND KRAMER, JUDGES.

KRAMER, JUDGE: The Oldham Circuit Court determined that Appellants David and Betty Adams entered an enforceable agreement with their neighbors, Appellees Cynthia and James Greene,[1] to convey the Greenes .51 acres of their property to settle a quiet title dispute. The Adamses now appeal the circuit court's enforcement of the settlement agreement and consequent dismissal of their quiet title action against the Greenes, arguing no such agreement was effectively formed. Upon review, we reverse.

Before discussing whether the settlement agreement at issue in this appeal was effectively formed, we begin by reviewing what the settlement agreement was designed to address. David and Betty Adams owned a sixteen-acre tract bordering Hall Hill Road in Oldham County. In 1999, they deeded their son a rectangular tract consisting of one of their sixteen acres, along with an explicit easement through their remaining acreage to permit access to the one-acre tract from Hall Hill Road.

The conflict that ultimately gave rise to much of the underlying litigation involves *where* that explicit easement was intended to be. By its own terms, the deed to their son's one-acre tract offers no description of the explicit easement. And, while a recorded July 30, 1998 plat map, commissioned by the Adamses and referenced by the son's recorded deed, depicts a forty-foot-wide road

---

[1] The other named Appellees are lienholders but have not participated in this appeal.

traversing roughly 1000 feet of the Adamses' acreage[2] (ending near a corner of the one-acre tract and abutting approximately fifty feet of the one-acre tract's boundary), the plat map also qualifies that road as a "proposed" easement.

Compounding the issue, the Adamses assert that after their son built a home on the one-acre tract, he never used the "proposed easement" delineated on the plat map to access Hall Hill Road while he resided at the one-acre tract from 1999 through 2005. In that vein, it is uncontested that in 1999, their son built a driveway across a *different* part of the Adamses tract to access Hall Hill Road.

It is also uncontested that the Adamses ultimately built a home directly *on top* of where their plat had located the "proposed easement."

Keeping that in mind, the proper location of the explicit easement appurtenant to the one-acre tract became a clear point of contention in 2016. In April of 2016, the Adamses sought a variance from the Oldham County Planning and Zoning Commission to allow them to further subdivide their property; but, the commission refused to grant them a variance because the "proposed easement" depicted on the Adamses' recorded plat map interfered with the Adamses' subdivision plans. Accordingly, the Adamses sought a release of the "proposed

---

[2] In a June 28, 2016 affidavit of record, David Adams explained the "proposed easement" set forth in the July 30, 1998 plat map followed an old farm road along the edge of his tract. But, because the farm road later proved unsuitable for the heavy equipment and trucks that were used to construct his son's house on the one-acre tract, he helped his son construct the other driveway that his son used to access his tract from Hall Hill Road.

easement" – an easement they believed existed on their plat map merely due to a mistake.

At the time, however, the Adamses' son no longer owned the one-acre tract. He had sold it to Cynthia Greene on September 21, 2005. And, when the Adamses approached Cynthia and her husband, James,[3] about releasing the "proposed easement," the Greenes refused.

Thus, on July 1, 2016, the Adamses initiated a quiet title action in Oldham Circuit Court against the Greenes to determine the proper location of the explicit easement. In their complaint, they asserted the driveway their son had built represented "the actual location" of the explicit easement, and that to the extent the "proposed easement" illustrated on the July 30, 1998 plat map indicated otherwise, that "proposed easement" had been effectively abandoned. The Adamses attached a September 14, 2005 survey to their complaint, which they alleged accurately depicted the course of the driveway that their son had built, and they asked the circuit court to "extinguish" the "proposed easement" depicted on the July 30, 1998 plat map and "replace" it with the easement depicted on their September 14, 2005 survey.

---

[3] As indicated, the Adamses' son conveyed the one-acre tract to Cynthia Greene. However, due to his spousal rights in the tract, James Greene has also been a party to these proceedings at all relevant times.

In their answer, the Greenes acknowledged that the driveway constructed by the Adamses' son traversed the Adamses' tract in a location other than what had been specified in the July 30, 1998 plat. But, they added, "The addition of a second road does not affect the Easement which was originally conveyed pursuant to the January 12, 1999 conveyance. No instrument was ever recorded releasing, correcting, or otherwise altering the Easement as conveyed in the deed dated January 12, 1999."

Accordingly, the Greenes denied the allegations of the Adamses' complaint and counterclaimed to assert their own rights to the easement depicted on the July 30, 1998 plat. Moreover, noting that the easement depicted on the plat ran directly through where the Adamses had built their home, the Greenes claimed the Adamses were liable to them for trespass and further sought to have the "obstruction" of their easement (*i.e.*, the Adamses' home) "removed." Apart from that, the Greenes also asserted adverse possession of what they described as "a well-defined parking lot area" that encroached upon the Adamses' tract, which they argued had been "maintained as part of the residence" located on their own one-acre tract.

Over two years of litigation followed, much of which involved liens associated with the parties' properties. However, on February 15, 2019, the Greenes filed what they labeled their "motion to enforce settlement with

plaintiffs." In it, the Greenes asserted that after the parties had filed their respective pleadings, they had proceeded to discuss amicably resolving their dispute via counsel. To that end, the Greenes asserted they had presented the Adamses with a settlement offer consistent with a survey they had commissioned in April 2018, which set forth the relevant sections of the parties' existing boundaries and which proposed new boundaries. They asserted their respective attorneys had reviewed the April 2018 survey during a May 16, 2018 telephone conference. And, they asserted, the Adamses, through their attorney, had effectively accepted their offer on May 23, 2019. Along with their motion, the Greenes tendered a "proposed agreed judgment" setting forth the terms of what they asserted was their agreement with the Adamses. Attached to the "proposed agreed judgment" was a September 10, 2018 survey of the parties' properties, which contained detailed metes and bounds but was otherwise largely identical to the April 2018 survey referenced by the Greenes.

Shortly thereafter, the Adamses filed an "objection" to the Greenes' motion, but they only objected to it "in part." Specifically, they noted that the "proposed agreed judgment" and the accompanying September 10, 2018 survey indicated that a total of .51 acres of their property would be deeded in fee simple to the Greenes, consisting of: (1) a .43-acre rectangular lot bordering the Greenes' tract, located near the terminus of the Greenes' access easement; and (2) a .08-acre

-6-

lot located near another part of the Greenes' boundary, encompassing an area labeled "lateral field." As to the "part" of the "proposed agreed judgment" they objected to, the Adamses asserted that during settlement negotiations, they had only "agreed" to grant the Greenes a "lease" or "temporary easement" to those .51 acres. Because the "proposed agreed judgment" instead specified the Greenes would be granted fee simple title to the .51 acres in question, the Adamses refused to execute the agreement. And because they refused to execute the agreement, the Adamses asserted that no settlement agreement had been effectively formed.

After considering the arguments of the parties and the evidence they adduced, the circuit court determined the Adamses had indeed entered an enforceable settlement agreement with the Greenes that contemplated a fee simple conveyance of .51 acres, as opposed to a lease or temporary easement as the Adamses claimed. It then enforced the agreement and, on that basis, dismissed the quiet title action. This appeal followed.

The construction of a contract is a matter of law. *Pearson ex rel. Trent v. National Feeding Systems, Inc.*, 90 S.W.3d 46, 49 (Ky. 2002) (citation omitted). A determination of law is likewise presented where the relevant facts are undisputed, and the dispositive issue is the legal effect of those facts. *See Fischer v. Fischer*, 197 S.W.3d 98, 106 (Ky. 2006). And, where factual findings are not at issue, and only legal questions are presented, our review is *de novo*. *See*

-7-

*Cincinnati Insurance Co. v. Motorists Mutual Insurance Co.*, 306 S.W.3d 69, 73 (Ky. 2010).

As indicated, the dispositive issue presented in this appeal is whether the parties, by and through their attorneys, effectively settled their litigation and, thus, formed a binding contract. *See Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. App. 2002) ("An agreement to settle legal claims is essentially a contract subject to the rules of contract interpretation."). As before, the Adamses argue the evidence does not reflect they agreed to convey the Greenes, in fee simple, .51 acres of their property.

Before getting to that issue, we must address an ancillary issue to put the case in the proper prospective.[4] The Adamses state "there exists no factual evidence in the form of sworn testimony or affidavits" supporting that a settlement agreement was formed. They further point out that, by and through their former counsel, they asked the Greenes to draft a written agreement representing their

---

[4] We note another ancillary issue that the Adamses raise. Given our decision in this matter, it has no bearing; but, we comment on it for completeness of our review of their brief. In the concluding sentence of their appellate brief, the Adamses state: "Appellants reserves [sic] the right to argue about the issue of whether former counsel had the authority to bind them to any settlement." To be clear, however, the concluding sentence of their appellate brief presents the only instance throughout this litigation where the Adamses have ever questioned "whether their former counsel had the authority to bind them to any settlement." Accordingly, to the extent this statement from the Adamses qualifies as an argument, it is unpreserved. *See Jones v. Livesay*, 551 S.W.3d 47, 52 (Ky. App. 2018).

-8-

settlement, and that they never executed the written agreement that the Greenes

ultimately drafted.

As discussed *infra*, however, factual evidence *did* exist – in the form

of correspondence between the parties' respective counsel. The Adamses have

never challenged the authenticity of any of the emails the circuit court relied upon

to conclude the Adamses entered a valid settlement with the Greenes. Moreover, a

contract is deemed to exist when correspondence demonstrates that the essential

elements of a contract have been fulfilled – not necessarily when a formal

agreement is executed. As explained in *Dohrman v. Sullivan*, 310 Ky. 463, 220

S.W.2d 973, 975 (1949),

> Preliminary negotiations leading up to the
> execution of a contract are distinguishable from the
> contract itself; likewise, a mere agreement to reach an
> agreement, which imposes no obligation on the parties
> thereto. It is sometimes a close question whether
> correspondence between parties constitutes final and
> complete mutual assent or meeting of minds, essential to
> the creation of a contract. The correspondence may
> constitute only negotiation and but evidence their
> intention ultimately to form or to execute a contract. The
> question of whether there was a consummated contract is
> to be determined from the consideration and practical
> construction of all the separate letters or telegrams that
> make up the whole correspondence. Shaw v. Ingram-
> Day Lumber Co., 152 Ky. 329, 153 S.W. 431, L.R.A.
> 1915D, 145; 17 C.J.S., Contracts, §§ 58, 62.

> The Restatement of the Law of Contracts, Vol. 1,
> sec. 26, thus states the applicable rule: 'Mutual
> manifestations of assent that are in themselves sufficient

to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but other facts may show that the manifestations are merely preliminary expressions.' To state the rule less abstractly: Where all the substantial terms of a contract have been agreed on and there is nothing left for future settlement, the fact alone that the parties contemplated execution of a formal instrument as a convenient memorial or definitive record of the agreement does not leave the transaction incomplete and without binding force in the absence of a positive agreement that it should not be binding until so executed. 12 Am. Jur., Contracts, secs. 23, 25.

We now turn our attention to the issue we must decide: Whether, based upon a consideration and practical construction of their whole correspondence, the Adamses and Greenes agreed upon the substantial terms of, and therefore consummated, a contract for the conveyance of .51 acres. In this respect, their correspondence began with a May 16, 2018 email from Christopher Tieke (one of the Greenes' attorneys) to Beach Craigmyle (one of the Adamses' attorneys). It stated:

Beach:

In preparation for our call, please see the attached plat. We can discuss further on the call.

Chris

Below, the parties agreed "the attached plat" referenced in this email was the previously indicated April 2018 survey commissioned by the Greenes,

-10-

which set forth the relevant sections of the parties' existing property boundaries, along with new proposed boundaries.[5] Of note, the survey included the following:

- An illustration of a road, labeled "EX. ACCESS ESMT. TO BE REMOVED," identical to the road that the recorded July 30, 1998 plat map had described as the "proposed easement." It clearly depicts the access easement the Adamses sought to remove.

- An illustration of another road, labeled "PROPOSED ACCESS ESMT. FOR EX. DRIVE," identical to the road the Adamses' September 14, 2005 survey had described as the driveway that the Adamses' son had built. It clearly depicts the "corrected" access easement the Adamses asked the Greenes to accept.

- A narrow, rectangular tract that bordered the Greenes' existing rectangular tract and also bordered the overlapping terminal points of the Greenes' "proposed" and "to be removed" access easements noted above. The narrow tract is described as 65 feet wide and 286.52 feet long. Below, the Adamses conceded the Greenes wished to use this precise area for additional parking.

_____

[5] During a May 13, 2019 hearing on this subject before the circuit court, the Adamses' attorney verified that the April 2018 survey discussed herein was indeed the survey discussed during the attorneys' telephone conference that followed the May 16, 2018 email from Tieke to Craigmyle. The Adamses also made the same representation to the circuit court in their "objection to motion to compel settlement," which they filed of record on February 22, 2019. On appeal, however, the Adamses have omitted any mention of the April 2018 survey in their brief.

Apart from that, a line from this narrow, rectangular tract points to the following notation:

18,623 SQ. FT.
.43 ACRES
TO BE GRANTED

- A four-sided, irregularly-shaped tract bordering another side of the Greenes' tract, matching the irregularly-shaped tract that the September 10, 2018 survey would later indicate was in the "lateral field" area. Of further note, the April 2018 survey indicated this tract was situated near what David Adams stated was a barn[6] on his property. And, a line from the irregularly-shaped tract points to the following notation:

3,542 SQ. FT.
.08 ACRES
TO BE GRANTED

Citing these aspects of their April 2018 survey, the Greenes represented to the circuit court, and continue to represent here, that the substantial terms of their settlement offer to the Adamses, as communicated during the May 16, 2018 telephone conference, entailed changing their explicit easement in the manner requested by the Adamses, in exchange for fee simple title to the .43-acre and .08-acre tracts identified in their April 2018 survey. They also note that the

---

[6] The barn, which is simply drawn as a square on the April 2018 survey, was identified by David Adams during the May 13, 2019 hearing on the Greenes' motion. The reason the Greenes asked for additional property in this area appears to relate to their home's septic system.

-12-

phrase "to be granted" was unqualified, and that if an easement or lease had been intended, that qualification would have been noted on the April 2018 survey – just as the term "ESMT." had qualified their rights regarding their driveway.

To be sure, the May 16, 2018 telephone conference between the parties' attorneys – part of the correspondence that formed the basis of what the Greenes contend was their settlement agreement with the Adamses – was never recorded. Nevertheless, the Adamses' attorney (Craigmyle) *did* relate what he recalled of that telephone conference in a May 17, 2018 email he sent to the Greenes' attorney (Tieke) and, taken objectively, his email reflects that he had the same understanding of the Greenes' offer. There, he stated:

> Chris, I will present this to David Adams, but this is basically identical to what I proposed to him at the very beginning (with the exception of the lateral fields). All he wanted to do at the beginning was get them to release the old easement and correct the actual location of their driveway easement (caused by their closing attorney's failure to reference the correct location of the driveway) so it would end up looking something like the attached drawing. *The Greens* [sic] *were basically agreeable, but always wanted something more* and held it out over Adams because they knew he had to get a release of the old easement if Planning and Zoning was going to let him have a variance on Tract 2 on the other side of the farm.
>
> *The more the Greens* [sic] *tried to force Adams to give or sell them some land around the parking lot and over by the barn*, the more he resisted being "held hostage" over

the farm road.[7]  *His reason for not wanting to give the* [sic] *more land around their driveway* was that he felt that little house already encroached too much into the back field that he hoped to sell off (that's probably why they made it rectangle instead of square in the first place).  Also, Adams has been upset for years about how junky their parking lot looked all the time with broken down cars, mowers, and piles of scrap lumber (see attached photo), which he thought would be a negative to anyone remotely interested in the field back there.

That brings us to the stalemate, so Adams had no choice but to file something to ask the court to remove the old easement, so I framed it as a simple DJ action that would either be granted or not, but Robert[8] turned it into a nuclear war with his counterclaims and vicious attacks on Adams.  His real estate people scrutinized the umpteen plats and required change after change, more accurately than 99% of the plats in Oldham County, then looked for some other reason not to do the deal.  Then they found a bunch of judgment liens, which I argued were irrelevant because they all postdated the construction of the driveway, but I lost on that, had to file the amended complaint, and just as expected, all the lienholders have consented.  *Now we are back to the Greens* [sic] *wanting more*, which is why I am doubtful my client will budge, especially after he made some overtures to speak with them to work this out and you told him to stay away.

However, I'm still willing to meet out there as this is something that should be resolved.

-Beach

---

[7] *See supra*, Note 2.

[8] "Robert" is an apparent reference to Robert M. Brooks, the attorney who initially represented the Greenes and assisted them with filing their various counterclaims against the Adamses.

(Emphasis added).

In short, the Adamses' attorney viewed the underlying quiet title action as a "stalemate," recognizing that the Greenes were unwilling to "correct" the location of their explicit easement, as the Adamses wanted, without getting "something more." The Adamses' attorney further identified the "something more" as "forc[ing] Adams to give or sell them some land around the parking lot and over by the barn." This is a proposition that was outlined by the unqualified phrase, "TO BE GRANTED," associated with the .08-acre and .43-acre tracts identified in the April 2018 survey that Craigmyle and the other attorneys reviewed during the telephone conference.

Furthermore, we agree with the Greenes and the circuit court that the unqualified phrase, "TO BE GRANTED," unambiguously contemplates a fee simple conveyance.

Craigmyle also explained he was "doubtful" the Adamses would "budge" (*i.e.*, accept the proposal that had been discussed among the attorneys during the telephone conference) because, from what he understood of it, they were "back to the Greens [sic] wanting more." And, to once again belabor the point, the *only* thing Craigmyle indicated the Greenes *wanted* was *"to force Adams to give or sell them some land around the parking lot and over by the barn."*

Despite his reservations, however, Craigmyle communicated with the Adamses. And, on May 23, 2018, he emailed Tieke, stating:

> Chris, good news. The Adams [sic] want to get this over with and are agreeable to your proposal! David said for you to "write it up" and send it to us. I would recommend you include a landscaping buffer surrounding the parking area, terms of the new easement, as well as a simple road maintenance agreement.
>
> Congrats.
>
> -Beach

On May 24, 2018, Tieke then responded to Craigmyle by email, stating:

> Beach:
>
> That is good news and we appreciate your efforts in presenting this to your client and *getting his agreement to the proposal*. I'll inform my client about this development and *we will go from there. More to follow*.
>
> Thanks again.
>
> Chris

(Emphasis added).

Kentucky law is well established regarding what is required to create a valid contract: "The fundamental elements of a valid contract are 'offer and acceptance, full and complete terms, and consideration.'" *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013) (citation omitted).

-16-

Here, considering the substance of the April 2018 survey, along with the email exchange between Tieke and Craigmyle set forth above, the Greenes' *offer* was clear: They asked for a .51-acre, fee simple conveyance. Moreover, a mutual exchange of unconditional promises to settle litigation is certainly adequate *consideration*.

The problem, though, is the *acceptance* element. To review, in the May 24, 2018 email set forth above, the Greenes' attorney, Tieke, thanked the Adamses' attorney, Craigmyle, for "getting [David Adams'] agreement to the proposal." But, undercutting that Adams had indeed manifested an unconditional acceptance of a settlement was Tieke's recognition that "more" needed to "follow."

Apart from that, however, the wording of Craigmyle's May 23, 2018 email undercut that notion further:

> The Adams [sic] want to get this over with and are agreeable to your proposal! David said for you to "write it up" and send it to us.

It is tempting to view these words as words of acceptance. But, being *agreeable* to something does not mean *agreeing* to something. Taken at face value, it means "to one's liking;" "pleasing;" "suitable;" comfortable;" or "*ready* to consent or submit."[9]

---

[9] *See* AMERICAN HERITAGE COLLEGE DICTIONARY 27 (3d ed. 1997) (emphasis added).

-17-

With that in mind, it is just as reasonable, if not more so, to interpret Craigmyle's use of the word "agreeable," used in conjunction with the phrase, "David said for you to 'write it up' and send it to us," to relate David Adams' preliminary or conditional acceptance:  David Adams liked *what his attorney had related to him about the substance of the Greenes' offer* and was ready to consent to *what his attorney had related to him about the substance of the Greenes' offer*, but he wanted to see the offer for *himself*.

In their appellee brief, the Greenes describe at length the amount of time and effort it took their attorneys, following the May 24, 2018 email, to complete the September 10, 2018 plat; draft the proposed agreed judgment; and conduct "title work," all to "finalize" their agreement with the Adamses.  Be that as it may, they acknowledge that despite repeated email requests from the Adamses' attorney to send a written agreement "for [the Adamses'] review,"[10] and repeated email assurances from their own attorneys that they would do so,[11] they did not put their offer in writing for the Adamses until January 3, 2019.

Indeed, it appears from the record that until January 3, 2019, the Greenes and their attorneys did not communicate with the Adamses and their

---

[10] Of record, and to this effect, are emails from Craigmyle dated August 10, 2018, and October 4, 2018.

[11] Of record, and to this effect, are emails from the Greenes' attorneys dated June 8, 2018; July 12, 2018; and August 7, 2018.

attorney *at all* about the terms of their purported agreement – despite receiving an August 7, 2018 email from Craigmyle, which appears to demonstrate that his understanding of the settlement terms conflicted with the Greenes' understanding. There, Craigmyle wrote:

> What are the proposed terms with respect to ownership of land outside the Greene's [sic] property, as the purpose of this declaratory action was to establish an access easement for the Greene's [sic] property, thus the IRS consent was limited to the establishment and relocation of the access easement and release of the original easement. *That extra land can be handled by lease or easement but not by sale*.

(Emphasis added).

Following his receipt of the Greenes' proposed agreed judgment, Craigmyle would later state in a February 13, 2019 email to the Greenes' attorneys that "Mr. Adams never agreed to give your clients ½ acre of land in fee simple but only an easement for the new driveway location and temporary rights for the parking area and septic[.]"  And, in a March 22, 2019 sur-reply he filed on behalf of the Adamses regarding the Greenes' "motion to enforce settlement with plaintiffs," Craigmyle would later represent he could "vouch for the fact"[12] that following the May 16, 2018 telephone conference, he informed the Adamses that

---

[12] Anticipating he would be called as a fact witness in this regard, Craigmyle withdrew from representing the Adamses on April 3, 2019.

"the grant" discussed as part of the Greenes' settlement offer "was in the nature of a lease," not an easement.

Again, *if* the Adamses' attorney *had* accepted the Greenes' settlement offer on their behalf on May 23, 2018, it could be argued that the Adamses would not be at liberty to subsequently repudiate their attorney's acceptance simply because their attorney misremembered the offer and misrepresented it to them. *See, e.g., Clark v. Burden*, 917 S.W.2d 574, 576-77 (Ky. 1996).

As explained, however, Craigmyle did not relate an unconditional acceptance on behalf of his clients through his May 23, 2018 email. In other words, the fact that Craigmyle's understanding apparently differed from the Greenes' understanding – regardless of the reason – simply underscores *why* "agreements" between agents are often put in writing before they become *agreements* between principals: Namely, to enable principals to avoid the risk of relying upon second-hand information, and to instead directly and objectively apprise themselves of an obligation before agreeing to be bound by it.

As stated in *Dohrman*, 220 S.W.2d at 975,

> Where all the substantial terms of a contract have been agreed on and there is nothing left for future settlement, the fact alone that the parties contemplated execution of a formal instrument as a convenient memorial or definitive record of the agreement does not leave the transaction incomplete and without binding force *in the absence of a positive agreement that it should not be binding until so executed*.

-20-

(Emphasis added) (citation omitted).

Here, the Adamses did not accept the Greenes' settlement offer on May 23, 2018. Rather, on that date and on several dates thereafter, they conveyed that they did not wish to be bound by any agreement until they were able to "review" it in writing. Upon first being presented with the Greenes' written offer, the Adamses rejected it. Accordingly, no settlement contract was formed, and the circuit court erred in dismissing their quiet title action on that basis.

Therefore, we REVERSE.


ALL CONCUR.


BRIEF FOR APPELLANTS:

D. Berry Baxter
LaGrange, Kentucky

BRIEF FOR APPELLEES CYNTHIA L. GREENE AND JAMES D. GREENE:

Scott Davidson
Peter M. Cummins
Louisville, Kentucky