**CINCINNATI INSURANCE COMPANY, Appellant,**

v.

**MOTORISTS MUTUAL INSURANCE COMPANY, Appellee.**

No. 2008–SC–000293–DG.

Supreme Court of Kentucky.

March 18, 2010.

Opinion of the Court by Chief Justice MINTON.

### I. *INTRODUCTION.*

This case requires us to decide whether a claim of defective construction against a homebuilder is, standing alone, a claim for property damage caused by an "occurrence" under a commercial general liability (CGL) insurance policy. Like the majority of courts that have considered the question, we hold that the answer is no.

### II. *FACTUAL AND PROCEDURAL HISTORY.*

Lawrence and Jennifer Mintman contracted with Elite Homes, Inc., for the construction of a residence. Elite substantially completed construction of the Mintmans' home, and the Mintmans moved into it and paid Elite in full.

About five years later, the Mintmans sued Elite; Joseph Pusateri, Elite's President; and Motorists Mutual Insurance Company, which insured Elite under a CGL policy during the period the home was under construction. The thrust of the Mintmans' complaint was that their home was so poorly built that it was beyond repair and needed to be razed and that Motorists had not properly handled the matter once it had been notified of Elite's faulty construction.

Motorists provided a defense for Elite and settled the Mintmans' claims against itself, Elite, and Pusateri. Under the terms of that settlement, the Mintmans and Elite assigned to Motorists all rights and claims they may have had against Cincinnati Insurance Company, which was a successor to Motorists, as Elite's CGL insurer. So Motorists then filed a third-party complaint against Cincinnati.[1] The

Brandon Wade Smith, Michael D. Risley, Stites & Harbison, PLLC, Louisville, KY, Counsel for Appellant.

David Sean Ragland, Paul Joseph Bishop, William P. Swain, Phillips, Parker, Oberson & Arnett, PLC, Louisville, KY, Counsel for Appellee.

1. It is unclear from the record what entity, if any, was Elite's insurer from July 1995 (when the policy with Motorists lapsed) until July 1996 (when the policy with Cincinnati began).

gist of that third-party complaint was Motorists' contention that Cincinnati had wrongfully breached its duty to defend and indemnify Elite from the Mintmans' claims.

Eventually, Motorists and Cincinnati filed cross-motions for summary judgment with respect to whether Elite's CGL policy with Cincinnati provided coverage for the Mintmans' claims. The trial court granted summary judgment to Cincinnati, holding that "the Mintmans' claims of intangible economic loss are not such as to be an event that qualifies as an 'occurrence' causing 'property damage' under the clear and unambiguous language of [Cincinnati's] CGL policy."

Although it conceded that "Cincinnati's argument is compelling," the Court of Appeals vacated the trial court's grant of summary judgment. Purportedly guided by our recent opinion in *Bituminous Casualty Corporation v. Kenway Contracting, Inc.,*[2] the Court of Appeals concluded that "since [CGL] policies are designed to cover broad risks, Motorists has the better argument. The damage to the Mintmans' house was clearly property damage and was caused by an 'occurrence' since the damage was undoubtedly accidental in the sense that it was not intentional."

We granted Cincinnati's motion for discretionary review in order to consider, apparently as a matter of first impression in Kentucky, whether faulty construction-related workmanship, standing alone, qualifies as an "occurrence" under a CGL policy. After carefully reviewing the record

and applicable law, we conclude that the trial court's conclusion that these claims are not an "occurrence" is correct. For that reason, we reverse the Court of Appeals.

## III. *ANALYSIS.*

### A. *The Policy Terms.*

The overarching question raised on appeal is whether the Mintmans' claims for faulty construction, which are now being advanced by Motorists, fall within the terms of the policy issued by Cincinnati to Elite. In order to answer that broad question, we must closely examine the relevant policy terms.

Section I(A)1 of the policy provides, in relevant part, as follows:[3]

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

. . . .

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence". . . .

Section V of the policy defines an *occurrence* as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The term *accident* is not defined in the policy. After carefully construing the policy and

In any event, no party has argued that the identity (or existence) of that insuring entity is germane to the narrow issues presented in this appeal.

**2.** 240 S.W.3d 633 (Ky.2007).

**3.** The CGL policy attached as an exhibit to Cincinnati's brief, as well as the policy contained in the record, appears to have been in effect from July 2002 until July 2003. Nevertheless, no party contends that the 2002 policy differs in a material way from the 1996 policy.

the relevant law, however, we conclude that this claim of faulty workmanship is not an "occurrence." [4]

### B. *The Standard of Review.*

 It is well settled that the proper interpretation of insurance contracts generally is a matter of law to be decided by a court; and, thus, an appellate court uses a de novo, not a deferential, standard of review.[5] Similarly, when we review a trial court's decision to grant summary judgment, as in this case, we must determine whether the trial court correctly found that there were no genuine issues of material fact; as findings of fact are not at issue, the trial court's decision is entitled to no deference.[6] Since there do not appear to be any genuine issues of material fact in this case, summary judgment was appropriate.

### C. *The Doctrine of Fortuity.*

 Although this precise issue of whether faulty construction workmanship may be an "occurrence" under a CGL policy appears to be a matter of first impression in Kentucky, many other courts have already addressed it; and they have come to differing conclusions.[7] After careful analysis, we agree with the Supreme Court of Nebraska's characterization of this as a "difficult question...."[8] The majority viewpoint, however, appears to be that claims of faulty workmanship, standing alone, are not "occurrences" under CGL policies.[9] Because we believe the majority viewpoint is correct, we adopt it.

 Since the term *accident* is not defined in the policy, we must afford it its ordinary meaning, if that meaning is not ambiguous.[10] We do not find the terms "accident" or "occurrence" to be ambigu-

---

4. Because we conclude that the faulty workmanship at issue does not meet the policy's definition of *occurrence*, we find it unnecessary to address Cincinnati's related argument that Elite's faulty workmanship also does not meet the policy's definition of *property damage*.

5. *See, e.g., Hugenberg v. West American Ins. Co./Ohio Cas. Group,* 249 S.W.3d 174, 185 (Ky.App.2006) ("Interpretation of insurance contracts is generally a matter of law to be decided by the court. As such, it is subject to de novo review on appeal.") (footnote omitted).

6. *Schmidt v. Leppert,* 214 S.W.3d 309, 311 (Ky.2007) ("When we review a trial court's decision to grant summary judgment, we must determine whether the trial court correctly found that there were no genuine issues of material fact. Since findings of fact are not at issue in this case, the trial court's decision is entitled to no deference.") (footnote omitted).

7. *See, e.g., General Sec. Indem. Co. of Arizona v. Mountain States Mut. Cas. Co.,* 205 P.3d 529, 534–35 (Colo.Ct.App.2009) (collecting cases).

8. *Auto–Owners Ins. Co. v. Home Pride Companies, Inc.,* 268 Neb. 528, 684 N.W.2d 571, 576 (2004).

9. *General Sec. Indem. Co. of Arizona,* 205 P.3d at 535 ("A majority of those jurisdictions has held that claims of poor workmanship, standing alone, are not occurrences that trigger coverage under CGL policies similar to those at issue here."). Though we do not need unduly to lengthen this opinion by listing their full citations, the Colorado Court of Appeals cited a federal case from the United States Court of Appeals for the Second Circuit, and state courts in Illinois, Iowa, Pennsylvania, and South Carolina, as comprising this majority viewpoint. *Id.*

 Additionally, the Supreme Court of Arkansas recently cited additional cases from state courts in Indiana, Ohio, North Dakota, West Virginia, Nebraska, Massachusetts, and New Hampshire as having come to similar conclusions. *See Essex Ins. Co. v. Holder,* 370 Ark. 465, 261 S.W.3d 456, 460 (2008).

10. *Bituminous Cas. Corp.,* 240 S.W.3d at 638.

ous,[11] at least under these facts.[12] Thus, since the term "accident" has also not acquired a technical meaning in the realm of insurance law, we must accord the term "accident" its plain meaning.[13]

■ Inherent in the plain meaning of "accident" is the doctrine of fortuity. Indeed, "[t]he fortuity principle is central to the notion of what constitutes insurance...."[14] Although we have used the term "fortuity" in the past, we have not fully explored its breadth and scope. In short, fortuity consists of two central aspects: intent, which we have discussed in earlier opinions, and control, which we have not previously discussed.

We recently recognized that the concept of fortuity is "inherent in all liability policies[,]" and explained that a loss was fortuitous if it was "not intended...."[15] And we were correct in so doing because the issue of intent is one important aspect of the fortuity doctrine. As a leading insurance treatise notes, "[t]ortuity primarily concerns intent."[16] So "a loss or harm is not fortuitous if the loss or harm is caused intentionally by [the insured]."[17]

As Motorists asserts, it is highly unlikely that Elite subjectively intended to build a substandard house for the Mintmans. After all, as the Supreme Court of Pennsylvania observed, "the situation is rare indeed in which a contractor intends that the work product suffer injury."[18] So

**11.** *Amerisure, Inc. v. Wurster Const. Co., Inc.,* 818 N.E.2d 998, 1002 (Ind.Ct.App.2002) ("an insurance contract is not regarded as ambiguous simply because controversy exists, and the parties have asserted contrary interpretations of the language of the contract.").

**12.** We also reject Motorists' seeming contention that an ambiguity was created by Cincinnati's letter to Elite declining coverage. In that letter, Cincinnati wrote that the Mintmans' allegations do not "appear to have arisen from an occurrence as defined in the policy." Motorists' argument is based upon semantic wordplay involving the word "appear." Cincinnati has clearly taken the position all along that it believed the Mintmans' claims fell outside the policy it issued to Elite. Moreover, although its usage of the less than definitive word *appear* in the letter declining coverage is somewhat curious, Cincinnati's usage of that term does not override the clear, unambiguous terms contained in the policy itself. In other words, the terms of the policy are controlling.

Similarly, we reject Motorists' argument that the letter declining coverage works as a waiver of Cincinnati's right to contest coverage. To the contrary, it is clear that despite the curious word choices used in the letter, the upshot of the very letter referenced by Motorists is a denial of coverage by Cincinnati. Moreover, Cincinnati has continued to deny coverage in the circuit court, Court of Appeals, and this Court.

**13.** *Fryman for Fryman v. Pilot Life Ins. Co.,* 704 S.W.2d 205, 206 (Ky.1986) ("The words 'accident', 'accidental', and 'accidental means', as used in insurance policies, have never acquired a technical meaning in law, and must be interpreted according to the usage of the average man and as they would be read and understood by him in the light of the prevailing rule that uncertainties and ambiguities must be resolved in favor of the insured.").

**14.** 46 C.J.S. *Insurance* § 1235 (2009). *See also* 16 Eric Mills Holmes, *Holmes' Appleman on Insurance 2d* § 116.1B (2000) ("Fortuity is perhaps the most fundamental principle of insurance and insurance law.... The fortuity principle is central to understanding what constitutes insurance.").

**15.** *Aetna Cas. & Sur. Co. v. Commonwealth,* 179 S.W.3d 830, 836 (Ky.2005) ("we state first that we agree with ANI and the Court of Appeals that the requirement that loss be fortuitous, *i.e.* not intended, is a concept inherent in all liability policies.").

**16.** 16 *Holmes' Appleman on Insurance* at § 116.1B.

**17.** *Id.*

**18.** *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.,* 589 Pa. 317, 908 A.2d 888, 899 n. 9 (2006).

adoption of Motorists' viewpoint would mean that insurance policies would become performance bonds or guarantees because any claim of poor workmanship would fall within the policy's definition of an accidental occurrence so long as there was not proof that the policyholder intentionally engaged in faulty workmanship. This is a point made by other courts.[19] Instead, we agree with the Supreme Court of South Carolina that refusing to find that faulty workmanship, standing alone, constitutes an "occurrence" under a CGL policy "ensures that ultimate liability falls to the one who performed the negligent work ... instead of the insurance carrier. It will also encourage contractors to choose their subcontractors more carefully instead of having to seek indemnification from the subcontractors after their work fails to meet the requirements of the contract." [20]

Motorists' viewpoint reflects the minority viewpoint of other courts who have considered this issue.[21] And we agree with

---

19. *See, e.g., id.* at 899 ("We hold that the definition of 'accident' required to establish an 'occurrence' under the policies cannot be satisfied by claims based upon faulty workmanship. Such claims simply do not present the degree of fortuity contemplated by the ordinary definition of 'accident' or its common judicial construction in this context. To hold otherwise would be to convert a policy for insurance into a performance bond. We are unwilling to do so, especially since such protections are already readily available for the protection of contractors.") (footnote omitted); *Nabholz Const. Corp. v. St. Paul Fire and Marine Ins. Co.,* 354 F.Supp.2d 917, 922 (E.D.Ark.2005) ("The Court is further persuaded by the distinctions between CGL policies and performance bonds. The purpose of a CGL policy is to protect an insured from bearing financial responsibility for unexpected and accidental damage to people or property. It is not intended to substitute for a contractor's performance bond, the purpose of which is to insure the contractor against claims for the cost of repair or replacement of faulty work. [Contractor] might have elected to purchase a performance bond to protect it from the known business risk that its subcontractor would not perform its contractual duties. That [contractor] has no remedy for its subcontractor's default under its CGL Policy is neither troublesome nor unexpected given the nature of the risks involved."); *Cincinnati Insurance Companies v. Collier Landholdings, LLC,* 614 F.Supp.2d 960, 966 (W.D.Ark.2009) ("The performance bond is the proper instrument for protection against financial loss arising from the repair and remediation of defective construction. It protects the general contractor to the extent of his or her work, irrespective of whether subcontractors performed certain aspects of that work. In other words, a general contractor cannot segment his or her work into that performed by various subcontractors, some of which is defective and some of which is not, in order to create an occurrence.") (citations and quotation marks omitted); *United States Fidelity & Guaranty Corp. v. Advance Roofing & Supply Co., Inc.,* 163 Ariz. 476, 788 P.2d 1227, 1233 (Ariz.Ct.App.1989) ("Nevertheless, we recognize that there are some authorities that appear to conclude that the mere showing of faulty work is sufficient to bring a claim for resulting damages (of whatever nature) within policy coverage. In our opinion these authorities disregard the fundamental nature of a comprehensive general liability policy of the type involved in this litigation, and ignore the policy requirement that an occurrence be an accident. If the policy is construed as protecting a contractor against mere faulty or defective workmanship, the insurer becomes a guarantor of the insured's performance of the contract, and the policy takes on the attributes of a performance bond. We find these authorities unpersuasive.") (citations omitted).

20. *L–J, Inc. v. Bituminous Fire and Marine Ins. Co.,* 366 S.C. 117, 621 S.E.2d 33, 37 (2005).

21. *See General Sec. Indem. Co. of Arizona,* 205 P.3d at 535 ("a minority of jurisdictions has held that the damage resulting from faulty workmanship is an accident, and thus, a covered occurrence, so long as the insured did not intend the resulting damage."). The Colorado Court of Appeals cited a case from the United States District Court for the District of Utah, as well as state courts in Florida, Kansas, Tennessee, Texas, and Wisconsin, as being members of this minority. *Id.*

the Supreme Court of Pennsylvania that Motorists' position "is an overly broad interpretation of accident" that fails to take into account the full nature of the concept of fortuity.[22] In other words, although we may have done so in factually distinguishable cases in the past, we rightly should not end our analysis in this case by merely concluding that coverage exists simply because it is virtually certain that Elite would not have intentionally built a shoddy home for the Mintmans.

■■■ For an event to be truly fortuitous, it must, of course, be accidental because the policy only covers occurrences that are accidents. Of course, one cannot intend to commit an accident because an accident is "an event that takes place without one's foresight or expectation...."[23] Or, as our late colleague William E. McAnulty, Jr., wrote as a judge of the Kentucky Court of Appeals, an accident in the insurance law context is "something that does not result from a plan, design, or ... intent on the part of the insured."[24] So focusing solely upon whether Motorists intended to build a faulty house is insufficient. Rather, a court must also focus upon whether the building of the Mintmans' house was a " 'chance event' beyond the control of the insured [Elite]."[25] Or, in other words, a court must bear in mind that a fortuitous event is one that is "beyond the power of any human being to bring ... to pass, [or is] ... within the control of third persons...."[26] It is abundantly clear, therefore, that the issue of control is encompassed in the fortuity doctrine.

Clearly, Elite had control over the construction of the Mintmans' home, either directly or through the subcontractors it chose. One cannot logically say, therefore, that the allegedly substandard construction of the Mintmans' home by Elite was a fortuitous, truly accidental, event. This leads to the inevitable conclusion that the faulty workmanship claim at issue is not covered by the CGL policy Elite purchased from Motorists because the faulty workmanship was not an accidental occurrence. As stated before, this conclusion is in accordance with decisions of numerous other courts comprising the majority viewpoint. Simply put, "[f]aulty workmanship is not an accident...."[27]

### D. Precedent Does Not Compel a Different Conclusion.

#### 1. Bituminous Cas. Corp. v. Kenway Contracting, Inc.

We reject any contention that Bituminous Cas. Corp. compels a different result. Bituminous Cas. Corp., greatly relied upon by both the Court of Appeals and Motorists, did involve, like the case at

---

**22.** Kvaerner Metals Div. of Kvaerner U.S., Inc., 908 A.2d at 899 n. 9 ("While the majority of Courts have held that coverage under a CGL policy is not triggered by poor workmanship which causes injury to the work product itself, a minority of jurisdictions have held that faulty or negligent workmanship constitutes an accident so long as the insured did not intend for the damage to occur. We believe that this is an overly broad interpretation of accident, as the situation is rare indeed in which a contractor intends that the work product suffer injury. Because we believe that CGL policies are not the proper means to protect against such risks, we concur with the majority of Courts and decline to apply coverage in such cases.") (citations omitted).

**23.** Essex Ins. Co., 261 S.W.3d at 460.

**24.** Stone v. Kentucky Farm Bureau Mut. Ins. Co., 34 S.W.3d 809, 812 (Ky.App.2000).

**25.** 16 Holmes' Appleman on Insurance 2d at § 116.1B.

**26.** 46 C.J.S. Insurance at § 1235.

**27.** Essex Ins. Co., 261 S.W.3d at 460.

hand, a CGL policy dispute over whether a contractor's actions constituted an "occurrence." But the contractor's action in *Bituminous Cas. Corp.* is readily factually distinguishable from the case at hand because that case was not a faulty construction case.

The contractor in *Bituminous Cas. Corp.* improperly demolished over half of a residential structure.[28] We held that the contractor's improper destructive act was an "occurrence" under the CGL policy because the damage to the property was "not the plan, design, or intent of the insured."[29] Given that conclusion, we did not address the control aspect of the fortuity doctrine. *Bituminous Cas. Corp.* does not compel a conclusion that Elite's allegedly substandard construction of the Mintmans' home in the case at hand is an "occurrence" because the quick destruction of a residence is manifestly a completely different undertaking than the protracted improper construction of a residence. The home construction in the case at hand occurred over a period of weeks; the mistaken destruction of a carport in *Bituminous Cas. Corp.* occurred in a short flurry of activity on only one day. Because of this inescapable, material factual difference, *Bituminous Cas. Corp.* is not controlling on the narrow issue presented in this case: whether a claim of faulty construction may qualify as an "occurrence" under a standard CGL policy.

2. *James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co.*

Likewise, we do not believe our nearly two-decade old decision in *James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co.*[30] compels us to affirm the Court of Appeals. Again, that case is markedly factually distinguishable from the case at hand.

*James Graham Brown Foundation, Inc.* involved a question of whether a CGL policy purchased for a wood treatment facility provided coverage for a federally mandated environmental cleanup. We held that the trial court erred by finding on summary judgment that there was no "occurrence" under the CGL policy.[31] In the course of explaining our decision, we made some expansive statements about CGL policies. Specifically, we opined that the term "occurrence" is to be "broadly and liberally construed" and that a CGL policy's very nature "suggests" an "expectation of maximum coverage."[32] Furthermore, we held that "if injury was not actually and subjectively intended or expected by the insured, coverage is provided even though the action giving rise to the injury itself was intentional and the injury foreseeable."[33]

Perhaps some of our language in *James Graham Brown Foundation, Inc.* could lead to the conclusion reached by the Court of Appeals. But a close examination of the different definition of *occurrence* in that case and this one reveals that our decision in *James Graham Brown Foundation, Inc.* does not compel affirming the Court of Appeals in this case.

▪▪▪ The CGL policies *in James Graham Brown Foundation, Inc.* defined *occurrence* as "[a]n accident, including continuous or repeated exposure to conditions, which result in bodily injury or property

28. 240 S.W.3d at 636.

29. *Id.* at 639.

30. 814 S.W.2d 273 (Ky.1991).

31. *Id.* at 281.

32. *Id.* at 278.

33. *Id.*

damage, *neither expected nor intended from the standpoint of the insured.*[34] The language referencing the expectations and intentions of the insured led us to adopt a broad, subjective standard of policy construction. The policy at hand, however, in accordance with modern CGL policies, completely omits from the definition of *occurrence* any language referencing the expectations or intent of the insured.[35]

The policy at issue in *Bituminous Cas. Corp.* contained the same definition of *occurrence* as does the policy in the case at hand.[36] In *Bituminous Cas. Corp.*, there-fore, we likely should not have quoted and relied upon much of the sweeping language of *James Graham Brown Foundation, Inc.* without acknowledging that the policy to be interpreted in *Bituminous Cas. Corp.* contained a definition of *occurrence* materially different from that found in *James Graham Brown Foundation, Inc.*[37] Upon reflection, we now recognize the crucial, materially different definition of *occurrence* in this case renders *James Graham Brown Foundation, Inc.* of, at most, limited value in determining whether there is an "occurrence" in the case at hand.[38]

34. *Id.* at 275 (emphasis added).

35. 9A *Couch on Insurance* § 129:3 (2009) ("As initially drafted in 1966, the occurrence definition essentially contained the language of what is now commonly known as the intentional acts exclusion. The original definition stated that an occurrence was 'an accident, including injurious conditions which results during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.' While this exclusionary language was eventually separated from the occurrence definition and was included as a separate exclusion within the policy, the inclusion of this language in the definition of an occurrence initially has created an ongoing split among courts across the country as to whether an intentional act with unintentional consequences is an occurrence.") (footnote omitted).

We are aware that the language regarding an insured's intent and expectations is now contained in the exclusions portion, specifically Section I(A)(2)(a), of the CGL policy. In pertinent part, that subsection provides that the policy does not apply to bodily injury or property damage that "may reasonably be expected to result from the intentional or criminal acts of an insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than actually expected or intended." However, a court need not consider the applicability of an exclusion if there is no initial grant of coverage under the policy. *See, e.g., Amerisure, Inc.*, 818 N.E.2d at 1005 ("In simplistic terms, the process is such: if the insuring clause does not extend coverage, one need look no further. If coverage exists, exclusions must then be considered. If an exclusion excludes coverage, an exception to the exclusion may re-grant coverage. However, the entire process must begin with an initial grant of coverage via the insuring clause; otherwise, no further consideration is necessary. Therefore, in the present case, we do not address any arguments regarding exclusions or exceptions to exclusions because here there is no initial coverage due to the lack of ... an 'occurrence.' "). Since we conclude that there is no coverage in this case because there was no occurrence, we need not examine any exclusions.

36. 240 S.W.3d at 639.

37. *See id.* at 638 (devoting section IV(A) to the purposes underlying CGL policies by liberally quoting from *James Graham Brown Foundation, Inc.*).

As discussed before, we do not question the result in *Bituminous Cas. Corp.* because of the factual distinctions between it and the case at hand

38. *See, e.g., Gen. Sec. Indem. Co. of Arizona*, 205 P.3d at 537 (distinguishing prior precedent because that precedent construed a policy defining an *occurrence* based, in part, on the expectations or intentions of the insured; but the policy in the instant case "does not focus on the *expectations or intentions* from the insured's standpoint. Thus, our interpretation of the term here need not be limited to

Even if we broadly construed the term, however, faulty construction would not constitute an "occurrence" because, as previously explained, the poor workmanship was not an accident.[39] Because the allegedly poor workmanship at issue cannot reasonably be construed to fall within the policy's definition of *occurrence,* then Elite (and, by extension, Motorists) cannot reasonably expect coverage for the acts at issue.[40] To the contrary, we believe the policy's requirement that its coverage extends only to an "occurrence," combined with the policy's definition of *occurrence,* is an "unequivocal, conspicuous and plain and clear manifestation of the company's intent to exclude coverage. . . ."[41] As Justice David Souter noted in an opinion he wrote while serving on the Supreme Court of New Hampshire, defective workmanship does not meet the definition of fortuity; and, thus, "[d]espite proper deference, then, to the reasonable expectations of the policyholder, we are unable to find in the quoted policy language a reasonable basis to expect coverage for defective workmanship."[42]

### E. *Cincinnati Owed No Duty to Defend in this Case.*

We likewise reject Motorists' contention that Cincinnati had a duty to defend Elite because there was a possibility at the outset that the Mintmans' allegations came within the scope of the CGL policy Elite purchased from Cincinnati. As Motorists correctly points out, our precedent holds that "an insurer has a duty to defend if there is any allegation which potentially, possibly or might come within the coverage terms of the insurance policy."[43] However, as we explained in the very next sentence of *Aetna Cas. & Surety Co.,* an insurer need not always defend against a claim it believes falls outside the policy it issued. Rather, if an insurer makes a determination that the claim is not covered, it may, among other equally valid choices, "elect not to defend."[44] Thus, Cincinnati's refusal to defend Elite against a claim clearly falling outside the policy at issue was not inherently improper.

### F. *Summary.*

In summary, we join the majority of other courts who have considered this question by holding that "a claim for faulty

the expectations or intentions of the insured.").

**39.** *Essex Ins. Co.,* 261 S.W.3d at 460 ("Faulty workmanship is not an accident; instead it is a foreseeable occurrence, and performance bonds exist in the marketplace to insure the contractor against claims for the cost of repair or replacement of faulty work.").

**40.** *James Graham Brown Foundation,* 814 S.W.2d at 277 ("The insurer's responsibility under a comprehensive policy is not measured by its intent. The insured is entitled to all the coverage he may reasonably expect under the policy.").

**41.** *Id.* ("Only an unequivocal, conspicuous and plain and clear manifestation of the company's intent to exclude coverage will defeat

this expectation [of coverage by an insured under a CGL policy].").

**42.** *McAllister v. Peerless Ins. Co.,* 124 N.H. 676, 474 A.2d 1033, 1036 (1984).

**43.** *Aetna Cas. & Surety Co., Inc.,* 179 S.W.3d at 841.

**44.** *Id.* ("If the insurer believes there is no coverage, it has several options. One is to defend the claim anyway, while preserving by a reservation of rights letter its right to challenge the coverage at a later date. Another is to elect not to defend. However, should coverage be found, the insurer will be liable for all damages naturally flowing from the failure to provide a defense.") (internal quotation marks omitted).

workmanship, in and of itself, is not an "occurrence" under a commercial general liability policy because a failure of workmanship does not involve the fortuity required to constitute an accident."[45]

## IV. CONCLUSION.

For the foregoing reasons, the decision of the Court of Appeals is reversed; and the judgment of the trial court granting summary judgment to Cincinnati Insurance Company is reinstated.

All sitting. All concur.

---

**45.** 9A *Couch on Insurance Third Edition* § 129:4 (2009).

It appears as if a general rule exists whereby a CGL policy would apply if the faulty workmanship caused bodily injury or property damage to something other than the insured's allegedly faulty work product. *Id.* ("In other words, although a commercial general liability policy does not provide coverage for faulty workmanship that damages only the resulting work product, the policy does provide coverage if the faulty workmanship causes bodily injury or property damage to something other than the insured's work product."). Thus, as we construe it, application of the general rule could lead to coverage if, for example, the Mintmans' allegedly improperly constructed home damaged another's property. However, we need not definitively decide in this case whether we should adopt this general rule, as the facts do not present a claim that would fall within it.