RENDERED: JANUARY 6, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1410-MR

TAMMY RATLIFF, AS PERSONAL
REPRESENTATIVE AND
ADMINISTRATRIX OF THE ESTATE
OF AMY RATLIFF; JORDAN ISAIAH
RATLIFF; NATHANAEL RYAN
TACKETT; AND TAMMY RATLIFF,
AS NEXT FRIEND OF NATHANAEL
RYAN TACKETT                                                          APPELLANTS


                          APPEAL FROM LETCHER CIRCUIT COURT
v.                        HONORABLE JAMES W. CRAFT, II, JUDGE
                          ACTION NO. 13-CI-00454


KENTUCKY FARM BUREAU
MUTUAL INSURANCE COMPANY;
CODY SHELBY; AND TIMOTHY
PAUL SHELBY AS PERSONAL
REPRESENTATIVE AND
ADMINISTRATOR OF THE ESTATE
OF TIMOTHY LEE SHELBY                                                  APPELLEES

AND


NO. 2021-CA-1411-MR

TAMMY RATLIFF, AS PERSONAL
REPRESENTATIVE AND
ADMINISTRATRIX OF THE ESTATE

OF AMY RATLIFF; JORDAN ISAIAH
RATLIFF; NATHANAEL RYAN
TACKETT; AND TAMMY RATLIFF,
AS NEXT FRIEND OF NATHANAEL
RYAN TACKETT                                                    APPELLANTS


                        APPEAL FROM LETCHER CIRCUIT COURT
v.                      HONORABLE JAMES W. CRAFT, II, JUDGE
                                ACTION NO. 13-CI-00454


CODY SHELBY; KENTUCKY FARM
BUREAU MUTUAL INSURANCE
COMPANY; AND TIMOTHY PAUL
SHELBY AS PERSONAL
REPRESENTATIVE AND
ADMINISTRATOR OF THE ESTATE
OF TIMOTHY LEE SHELBY                                            APPELLEES


                                OPINION
                                AFFIRMING

                            ** ** ** ** **

BEFORE:  LAMBERT, MAZE, AND TAYLOR, JUDGES.[1]

LAMBERT, JUDGE:  These appeals arise from an action in Letcher Circuit Court

filed as a result of the shooting death of Amy Ratliff by Timothy Shelby.  Tammy

Ratliff, as Personal Representative and Administratrix of the Estate of Amy Ratliff;

---

[1] Judge Irv Maze concurred in this Opinion prior to his retirement from the Court of
Appeals.  Release of this Opinion was delayed by administrative handling.

Jordan Isaiah Ratliff; Nathanael Ryan Tackett; and Tammy Ratliff, as Next Friend of Nathanael Ryan Tackett, a minor (collectively, "Ratliff"), have appealed from two summary judgments entered in October 2021. The first appeal is from an order granting Kentucky Farm Bureau Mutual Insurance Company's ("KFB") renewed motion for summary judgment and holding that no coverage existed under the homeowner's policy. The second is from the order granting Cody Shelby's motion for summary judgment and holding that there was no genuine issue of material fact as to foreseeability. We affirm both orders.

In the late night and early morning hours of August 1 and 2, 2013, Timothy Lee Shelby ("Timothy") shot and killed three people before killing himself. He first killed his girlfriend, Jennifer Walters, in the bedroom of his house. He then drove to Amy Ratliff's ("Amy") residence, where he killed Amy and her boyfriend, Josh Wyatt, before shooting himself in the stairway. At the time of her death, Amy was the mother of two minor children, Jordan and Nathanael. On December 18, 2013, Tammy Ratliff, who was Amy's mother and had been appointed as the Administratrix of Amy's Estate, filed a wrongful death complaint against Timothy's Estate on behalf of Amy's Estate and the two minor children. Ratliff alleged that Timothy was negligent and grossly negligent in injuring Amy and causing her death. Her death caused the children to endure the

loss of consortium, care, and parental guidance. Ratliff sought compensatory and punitive damages totaling $1B for each of the plaintiffs.

On February 27, 2015, Ratliff filed an amended complaint properly naming Timothy Paul Shelby, Timothy's son, as Personal Representative and Administrator of the Estate of Timothy Lee Shelby, as the defendant ("Shelby"). Ratliff also named Timothy's son, Cody Shelby ("Cody"), as a defendant, alleging that Cody's actions contributed to Amy's death. Shelby and Cody filed separate answers, in which they sought dismissal of Ratliff's complaint and pled several affirmative defenses.

In June 2016, KFB moved the court to file an intervening complaint, which was granted. In the intervening complaint, KFB alleged that it had issued a homeowner's policy to Timothy (policy number HO 808238) on July 8, 2009. KFB maintained that this policy was no longer in effect on August 1, 2013, as it had expired for the non-payment of the premium. KFB had been providing Shelby and Cody a defense under a reservation of rights. Therefore, KFB sought a declaration of rights as to coverage under the policy based upon its expiration due to non-payment of the premium and whether it had an obligation to provide a defense and satisfy a judgment entered against either Shelby or Cody. In her answer, Ratliff contended that the homeowner's policy was in effect on August 1, 2013. Ratliff also filed a cross-claim against KFB, alleging a violation of the

Kentucky Unfair Claims Settlement Practices Act, Kentucky Revised Statutes ("KRS") 304.12-230 and KRS 304.12-235, and she sought compensatory and punitive damages as well as attorney's fees.

Later that month, Cody moved to dismiss Ratliff's amended complaint for failure to state a claim against him upon which relief could be granted. In the amended complaint, Ratliff alleged that Cody had a duty to promote safety in the community, which, he argued, was not a duty recognized in Kentucky. In addition, Ratliff did not describe what acts of his either caused or contributed to Amy's death. In response, Ratliff provided more information about Cody's actions. She stated that Cody had admitted to the police that he had opened the lock box where Timothy kept his gun and that he had given the loaded gun to Timothy, knowing that he was angry and intoxicated and that he had a history of violence. Ratliff included this information in her cross-claim against KFB. Ratliff requested that the motion to dismiss be denied or that she be permitted to amend her complaint. Following a hearing in September, the court denied Cody's motion to dismiss and granted Ratliff time to file a second amended complaint.

Ratliff filed a second amended complaint in October 2016, fleshing out more of the details of Cody's involvement and alleging that his providing the loaded gun to Timothy was a substantial factor in Amy's death.

In January 2018, KFB filed a motion for summary judgment as to its liability. KFB argued that Timothy's homeowner's policy had been canceled for non-payment of the premium on July 9, 2013. A notice of premium had been mailed to Timothy on June 6, 2013, and $661.43 was due to be paid by July 9, 2013. The premium was not paid, and KFB mailed an expiration notice to Timothy on July 20, 2013. The expiration notice indicated that as a courtesy, KFB would extend the payment due date until August 3, 2013, but if payment was not received by that date, coverage would have terminated as of July 9, 2013. The premium was not paid. KFB asserted that it had followed the provisions of KRS 304.20-035 and KRS 304.20-320, and that pursuant to KRS 304.20-320(2), proof of mailing was sufficient as proof of notice. In addition, KFB noted that a notice of lis pendens as well as a foreclosure action had been filed against Timothy in March of 2013, and that he had filed for bankruptcy on July 8, 2013. KFB concluded that because no policy of insurance was in effect on August 1, 2013, it was entitled to a judgment in its favor as to liability for defense and indemnity.

Ratliff objected to KFB's motion, stating that the notice from KFB indicated that the mortgagee, Embrace Home Loans, had been billed for the homeowner's insurance premium; KFB never asked Timothy to pay the premium. Ratliff asserted that KFB had not complied with the applicable statutes in canceling the policy. In addition, the events at issue in this lawsuit took place prior

to August 3, 2013. Therefore, KFB should be estopped from arguing that there was no coverage because Timothy died prior to that date and could no longer pay the premium by then.

After hearing arguments from the parties, the circuit court denied KFB's motion for summary judgment on February 13, 2018.

In November 2020, KFB filed a renewed motion for summary judgment, continuing to argue that the undisputed facts established that the policy had lapsed prior to the incident. KFB included a second argument that there was no coverage because the undisputed facts established that the claims did not arise from an accident and therefore could not constitute an occurrence under the policy. Ratliff filed an objection to the motion in September 2021, arguing that Amy's death constituted an occurrence under the policy. KFB also filed a supplemental memorandum, addressing both the policy lapse and lack of occurrence issues.

In January 2021, both Shelby and Cody were deposed by Ratliff, more than seven years after the shootings. Shelby testified that he had not spoken with his father, Timothy, for eight months prior to the shootings, explaining that they did not get along very well. He testified that Timothy had dealt with an alcohol problem his whole life, noting that he was a Vietnam War veteran. As to Timothy's finances, Shelby stated that he had helped his father with this for several years but had stopped doing so about a year before the incident. Timothy, Shelby

related, was not good about paying his bills. Shelby became the executor of Timothy's estate, and he went through Timothy's paperwork and bills on the dining room table. Shelby saw the cancellation notice from KFB indicating that the policy had expired in mid-June or July. He had not seen the renewal notice before the deposition, and when he was shown the document dated July 19th, he read that the mortgagee/lender had been billed for the premium and that the due date was August 3, 2013. Shelby knew that Timothy was in default on the mortgage and was going through bankruptcy. Shelby said that Timothy had guns in the house, except during the time he was a convicted felon. He had about ten guns, including pistols, shotguns, and rifles.

In his deposition, Cody testified about the circumstances leading to the shootings in early August 2013. He and his cousin, William, had been riding bikes. Cody decided to ask his father for some money. His father was half asleep watching television. His father reached for his wallet in his pants pocket but did not find it. He had just received between $5,000.00 and $6,000.00 from an insurance settlement, and he was angry that he could not find it. His father went to talk to Jennifer, and then he said to Cody, "get a gun out of the box for me to keep safe." Cody got a gun and locked it in his box before he left. He did not want to be part of his father getting angry. He went with William to his house, and then they went to Jordan Ratliff's house to meet up with him. He and William walked

into Jordan's house with Jordan. As he and William were removing their boots, Jordan walked through the utility room and kitchen to the stairwell. Jordan had a weird look on his face and told Cody to not go over there. Cody went over there, and when he turned the corner, he saw his father "laying there, gun between his legs laying in a pool of his own blood." He started crying, and William helped him out of the house. Around the time the police arrived, Cody remembered that his father had been angry earlier, and he told Jordan to check on his mother, Amy. Cody did not see anything else in the house. He asked Jim Stevens to check on his father's house. Cody did not know who called the police; he was crying on the back porch.

Cody did not know if his father had been drinking that day. His father had a Ruger Mark II 22/30 pistol that belonged to Cody. But Cody said that when his father told him to get it, Cody removed it from his father's storage box and put it in his own storage box. He locked it before he left; he said his father never touched that pistol. His father had told him to "take it, keep it safe, don't let anything ever happen to it." Cody said it had been stolen. His father had a 10 mm Glock, and to his knowledge, that was the gun his father used in the shootings. Cody only unlocked the box to get the Ruger Mark II pistol out, not the Glock. He said he locked his father's box after he removed the Ruger from it. Cody said his father occasionally had a temper.

Cody then testified about his police interview. He agreed that his father was probably blaming Jennifer for the missing money. Cody did not know how the other two people who were killed were involved with the missing wallet but agreed that his father probably was blaming them as well. Cody believed that Jennifer was a thief because some of his things had gone missing since his father started seeing her, including a flashlight and a bayonet that had belonged to his grandfather. He denied that his father asked him to get the Glock; he asked him to get the Ruger Mark II. Cody said he was the only person – other than his father – who knew how to open the container in which the Glock was kept. His father kept the key hidden.

The record also contains police reports and interviews conducted shortly after the shooting, which we have reviewed.

After the depositions were taken, Cody moved the court to dismiss the second amended complaint filed against him for failure to state a claim upon which relief could be granted as Ratliff failed to establish any recognized duty he had under Kentucky law to support a negligence claim. There was no special relationship between Amy and Cody that would impose a duty on him, and the result was not foreseeable. There was also no duty on Cody to control his father, Timothy. Ratliff objected to Cody's motion to dismiss.

In August 2021, Ratliff filed a motion for summary judgment on Cody's negligence or to deny Cody's motion to dismiss. Ratliff argued that Cody had admitted to negligence related to furnishing the gun to Timothy knowing what state he was in, which Timothy then used to kill three people who he believed had stolen his wallet containing several thousand dollars. In response, Cody continued to argue that he had no duty that could have been breached. In his sur-reply, Cody stated,

> The Plaintiffs argue, without a single case for authority, that Kentucky requires everyone to act with a general duty of care to everyone else. However, this argument ignores the fact that in order for there to be a duty, there has to be an identifiable person to whom the duty is owed. Any duty of care only exists to prevent injuries that are reasonably foreseeable. Kentucky law is clear that, in the majority of instances, criminal actions are not foreseeable.

Because Ratliff failed to establish that an exception to the law that a person cannot generally be held liable for the criminal actions of another applied, Cody argued that he was not under any duty to Amy, citing *James v. Wilson*, 95 S.W.3d 875 (Ky. App. 2002).

On October 18, 2021, the court granted Cody's motion for summary judgment, ruling that there was no genuine issue of material fact related to foreseeability. And the next day, the court granted KFB's motion for summary

judgment, declaring that no coverage existed under the policy for the claims asserted against either Shelby or Cody. These appeals by Ratliff now follow.

**I. KFB Coverage Appeal (No. 2021-CA-1410-MR)**

We shall first address whether the circuit court properly granted KFB's renewed motion for summary judgment and determined that no coverage existed under the homeowner's policy for the claims Ratliff asserted against Shelby or Cody. Ratliff argues that the policy had not lapsed at the time of Amy's death, that there was an occurrence under the policy which covered Timothy and Cody's actions, and that the intentional act exclusion did not defeat coverage in this case. The circuit court did not specify the basis upon which the summary judgment was granted, and KFB contends that summary judgment was proper under any of these grounds.

This Court's standard of review of a summary judgment is set forth in *Patton v. Bickford*, 529 S.W.3d 717, 723 (Ky. 2016):

> Summary judgment is a remedy to be used sparingly, *i.e.* "when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant." *Shelton v. Kentucky Easter Seals Society, Inc.*, 413 S.W.3d 901, 905 (Ky. 2013) (citations omitted). We frequently caution, however, the term "impossible" is to be used in a practical sense, not in an absolute sense. *See id.* (citing *Perkins v. Hausladen*, 828 S.W.2d 652, 654 (Ky. 1992)). The trial court's primary directive in this context is to determine whether a genuine issue of material fact exists; if so,

-12-

summary judgment is improper, *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). This requires that the facts be viewed through a lens most favorable to the party opposing summary judgment, here the Estate. *Id*. It is important to point out that "a party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Id*. at 482.

A motion for summary judgment presents only questions of law and "a determination of whether a disputed material issue of fact exists." *Shelton*, 413 S.W.3d at 905. Our review is de novo, and we afford no deference to the trial court's decision.

As to the interpretation of insurance contracts, in *James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Insurance Company*, 814 S.W.2d 273, 279 (Ky. 1991), the Supreme Court of Kentucky recognized:

The proper standard for the analysis of insurance contracts in Kentucky is a subjective one. *Fryman v. Pilot Life Insurance Company*, Ky., 704 S.W.2d 205 (1986) holds that terms of insurance contracts have no technical meaning in law and are to be interpreted according to the usage of the average man and as they would be read and understood by him in the light of the prevailing rule that uncertainties and ambiguities must be resolved in favor of the insured.

And in *Motorists Mutual Insurance Company v. RSJ, Inc.*, 926 S.W.2d 679, 681 (Ky. App. 1996), this Court recognized that "terms used in insurance contracts 'should be given their ordinary meaning as persons with the ordinary and usual understanding would construe them.' *City of Louisville v. McDonald*, Ky. App.,

-13-

819 S.W.2d 319, 320 (1991)." With these statements of the law in mind, we shall consider Ratliff's arguments.

The first issue is whether the homeowner's policy had lapsed for non-payment at the time of the shooting. The record and the parties' briefs reflect that KFB sent a renewal notice to Timothy on June 5, 2013. The notice provided that the policy would renew for the period of July 9, 2013, through July 9, 2014; that the premium amount was $661.43; that the due date was July 9, 2013; and that Timothy's mortgagee, Embrace Home Loans ISAOA/ATIMA, had been billed for the premium. When the premium had not been paid by the due date, KFB sent Timothy an expiration notice on July 19, 2013, stating:

> Your payment MUST be received in our office before 8/3/13. If not, coverage under this policy terminates. As a courtesy to you, we have extended the payment due date to 8/3/13. If your payment is not received by that date, coverage is terminated on 7/9/13 at 12:01 a.m. standard time.

There is no dispute that the premium payment had not been received by August 3, 2013.

Ratliff expends several pages arguing about notice and whether KFB followed the applicable provisions related to the policy cancellation. We need not address those arguments, however, because we agree – under the narrow and specific circumstances of this case – that the policy had not lapsed when the shooting took place between August 1 and 2, 2013. The expiration notice

-14-

specifically stated that the policy would not terminate unless the premium payment had not been received by August 3, 2013. Because Timothy had passed away prior to that date, albeit by his own hand, it was impossible for him to pay the premium by that date. He had at least one more day to pay the premium when the shooting and death occurred, and we hold that, for this reason, the policy had not lapsed when Amy passed away.

Next, we must consider whether Ratliff's claims arose from an occurrence covered under the policy. Under the definitions section of the policy, an "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period," in either bodily injury or property damage. The policy does not include a definition of "accident." Therefore, we look to caselaw for guidance:

> In the context of an insurance policy, the word "accident" should be interpreted in accordance with its common usage. *Fryman v. Pilot Life Ins. Co.*, Ky., 704 S.W.2d 205 (1986). In construing the language of a life insurance policy, the court in *Fryman* held that "a death is accidental absent a showing that the death was a result of plan, design, or intent on the part of the decedent." *Id.* at 206.

*Stone v. Kentucky Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809, 811 (Ky. App. 2000).

Ratliff contends that there were multiple occurrences under the policy, including Timothy killing Amy with a firearm, Cody giving Timothy a gun, and Cody failing to warn Amy about the danger he created. As to Timothy, Ratliff cites to the Supreme Court of Kentucky's opinion in *Brown Foundation, supra*, which states:

> We believe this to be the majority rule, and we agree that if injury was not actually and subjectively intended or expected by the insured, coverage is provided even though the action giving rise to the injury itself was intentional and the injury foreseeable. While the activity which produced the alleged damage may be fully intended, recovery will not be allowed unless the insured intended the resulting damages. *Cf. City of Johnstown v. Bankers Standard Insurance Company*, 877 F.2d 1146 (2nd Cir. 1989).

814 S.W.2d at 278. Ratliff contends that no one knows what Timothy's subjective intent was at the time of Amy's death and that, therefore, the policy should be construed to provide coverage in this instance. In addition, Ratliff argues that the inferred intent rule did not apply here, citing the following passage from *Stone*, *supra*: "[I]f an actor suffered from a mental defect that rendered him unable to understand the nature and quality of his acts, or unable to tell right from wrong, or unable to control his conduct, then the act was not considered intentional for the purposes of an intentional act exclusion in an insurance policy." *Stone*, 34 S.W.3d at 813.

On the other hand, KFB cites to *Cincinnati Insurance Company v. Motorists Mutual Insurance Company*, 306 S.W.3d 69, 76 (Ky. 2010), for the holding that an event must be accidental before it may be covered by a policy of insurance:

> For an event to be truly fortuitous, it must, of course, be accidental because the policy only covers occurrences that are accidents. Of course, one cannot intend to commit an accident because an accident is "an event that takes place without one's foresight or expectation . . . ." Or, as our late colleague William E. McAnulty, Jr., wrote as a judge of the Kentucky Court of Appeals, an accident in the insurance law context is "something that does not result from a plan, design, or . . . intent on the part of the insured." So focusing solely upon whether Elite intended to build a faulty house is insufficient. Rather, a court must also focus upon whether the building of the Mintmans' house was a "'chance event' beyond the control of the insured [Elite]." Or, in other words, a court must bear in mind that a fortuitous event is one that is "beyond the power of any human being to bring . . . to pass, [or is] . . . within the control of third persons . . . ." It is abundantly clear, therefore, that the issue of control is encompassed in the fortuity doctrine.

*Id*. at 76 (citations in footnotes omitted). KFB also cites to *Stone*, *supra*:

> The resulting bodily harm, or in this case death, cannot be conceived in any other way other than that which was the result of a plan, design, or intent. There is no doubt that pointing and firing a loaded rifle at Jeremy was an act "certain to cause a particular kind of harm . . . ."

*Stone*, 34 S.W.3d at 812-13 (citation omitted).

First, we agree with KFB that there was only one potential occurrence, not three as Ratliff asserts.

> [M]erely because there were multiple negligent acts that combined to cause a single injury or multiple causes of action may be asserted does not mean there were multiple occurrences as that term is unambiguously defined in the Kentucky Farm Bureau policy. There are frequently multiple acts of negligence that cause a single injury. For instance, a negligent driver in a car accident may have been inattentive because he was intoxicated and distracted by his texting and speeding. As a result of the driver's negligence, a collision occurs injuring another person. Under those circumstances, although there were multiple acts of negligence, it cannot be reasonably argued there was more than one accident caused by the driver's negligence.
>
> Under the unambiguous language of the policy, the meaning of "occurrence" in the Kentucky Farm Bureau policy is "accident." There was only one accident, Ja'Corey's choking on a push-pin.

*Davis v. Kentucky Farm Bureau Mutual Insurance Company*, 495 S.W.3d 159, 166-67 (Ky. App. 2016). The only potential occurrence was Amy's death as a result of Timothy's shooting; Cody's giving the gun to Timothy and his failure to warn Amy do not constitute potential occurrences under the homeowner's policy.

Second, we agree with KFB that the homeowner's policy does not include coverage for Ratliff's claims against Shelby or Cody because her claims do not arise from an occurrence. The event causing Amy's death – the shooting by Timothy – was in no way accidental. Ratliff's citation to *Brown Foundation* is

-18-

misplaced pursuant to the Supreme Court of Kentucky's holding in *Cincinnati Insurance*, *supra*, which addresses the same definition of "occurrence" as in the present case. The Court explained:

> Likewise, we do not believe our nearly two-decade old decision in *James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co.* compels us to affirm the Court of Appeals. Again, that case is markedly factually distinguishable from the case at hand.

> *James Graham Brown Foundation, Inc.* involved a question of whether a CGL policy purchased for a wood treatment facility provided coverage for a federally mandated environmental cleanup. We held that the trial court erred by finding on summary judgment that there was no "occurrence" under the CGL policy. In the course of explaining our decision, we made some expansive statements about CGL policies. Specifically, we opined that the term "occurrence" is to be "broadly and liberally construed" and that a CGL policy's very nature "suggests" an "expectation of maximum coverage." Furthermore, we held that "if injury was not actually and subjectively intended or expected by the insured, coverage is provided even though the action giving rise to the injury itself was intentional and the injury foreseeable."

> Perhaps some of our language in *James Graham Brown Foundation, Inc.* could lead to the conclusion reached by the Court of Appeals. But a close examination of the different definition of occurrence in that case and this one reveals that our decision in *James Graham Brown Foundation, Inc.* does not compel affirming the Court of Appeals in this case.

> The CGL policies in *James Graham Brown Foundation, Inc.* defined occurrence as "[a]n accident, including continuous or repeated exposure to conditions,

-19-

which result in bodily injury or property damage, neither expected nor intended from the standpoint of the insured." The language referencing the expectations and intentions of the insured led us to adopt a broad, subjective standard of policy construction. The policy at hand, however, in accordance with modern CGL policies, completely omits from the definition of occurrence any language referencing the expectations or intent of the insured.

The policy at issue in [*Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240 S.W.3d 633 (Ky. 2007),] contained the same definition of occurrence as does the policy in the case at hand. In *Bituminous Cas. Corp.*, therefore, we likely should not have quoted and relied upon much of the sweeping language of *James Graham Brown Foundation, Inc.* without acknowledging that the policy to be interpreted in *Bituminous Cas. Corp.* contained a definition of occurrence materially different from that found in *James Graham Brown Foundation, Inc.* Upon reflection, we now recognize the crucial, materially different definition of occurrence in this case renders *James Graham Brown Foundation, Inc.* of, at most, limited value in determining whether there is an "occurrence" in the case at hand.

*Cincinnati Ins. Co.*, 306 S.W.3d at 77-78 (footnotes omitted). We find no merit in Ratliff's arguments regarding Timothy's lack of intent or alleged diminished mental capacity to overcome the decision that the shooting was not accidental and, thus, not an occurrence under the policy.

Accordingly, because there was no occurrence under the policy, there can be no coverage for Ratliff's claims against Shelby or Cody.

-20-

Finally, Ratliff contends that the intentional act exclusion did not apply to defeat coverage. Under Section II – Exclusions, 1(a), the policy provides that personal liability coverage under Coverage E[2] does not apply to bodily injury "[w]hich is expected or intended by one or more 'insureds[.]'" KFB contends that this exclusion does apply to negate coverage for both Shelby and Cody. In *Goldsmith v. Physicians Insurance Company of Ohio*, 890 S.W.2d 644, 646-47 (Ky. App. 1994), this Court considered the application of the inferred intent rule:

> We now turn to the issue of the applicability of the inferred-intent rule when the insured asserts an incapacity to form an intent to harm as is argued by the appellant based upon the expert evidence of Dr. Lehne. Keeping in mind that the parties herein do not dispute that Wheeler's conduct was intentional, but only the existence of his specific intent to harm, we now return to the Third Circuit's opinion in [*Wiley v. State Farm Fire & Cas. Co.*, 995 F.2d 457 (3rd Cir. 1993)]. Commencing at p. 465 Judge Rosenn reviews the three basic lines of treatment of the issue and concluded at p. 467:
>
>> The first approach offers the better rule because in exceptional cases such as sexual child abuse, where the insured's conduct is both intentional and of such a nature and character that harm inheres in it, that conduct affords a sufficiently clear demonstration of intent to harm subsuming any need for a separate inquiry into capacity. Once it is determined, strictly by examining the nature and character of the act in

---

[2] As pertains to this case, Coverage E – Personal Liability provides that if a claim is made against an insured for damages due to bodily injury caused by an occurrence to which coverage applies, the policy will pay damages and provide a defense.

question, that it is appropriate to apply the inferred intent rule, then the actor's actual subjective intent to harm or capacity to form that intent becomes irrelevant. At that point, it does not matter whether a subjective intent existed or why it did or did not exist. Once subjective intent is deemed irrelevant, an actor who is unable to form the intent to harm is indistinguishable from one who could have formed the intent but claims he or she did not.

We totally agree with the foregoing view and hereby extend the views of [*Thompson v. West American Ins. Co.*, 839 S.W.2d 579 (Ky. App. 1992)], to reflect the same.

*Goldsmith*, 890 S.W.2d at 646-47 (citations omitted). Again, we agree with KFB that the inferred intent rule applies in this case to defeat coverage. As KFB states in its brief, "it would be unsound to hold that Timothy Lee Shelby did not intend to harm Amy Ratliff when he retrieved the gun and traveled to two separate homes and shot and killed three people before shooting and killing himself."[3]

And, once again, we agree with KFB that the policy's exclusion of coverage for bodily injury intended or expected by one or more of the insureds also applies to Ratliff's claims against Cody. *See K.M.R. v. Foremost Ins. Group*, 171 S.W.3d 751, 754 (Ky. App. 2005) ("[T]the intentional acts exclusion in the Foremost policy addresses the insureds more precisely and more directly,

---

[3] To be precise, the record reflects that Timothy only traveled to Amy's residence as he shot and killed Jennifer at his own residence.

excluding coverage for damages that are 'intended **by any of you** to cause any harm or that **any of you** could reasonably expect to cause harm.' (Emphasis added.) It denies protection to an innocent actor who is tainted by association with an intentional wrongdoer.").

Based upon the foregoing, we hold that the circuit court did not commit any error in holding that coverage did not apply under the policy for either Shelby or Cody or in granting summary judgment to KFB.

## II. Negligence Claim Against Cody (Appeal No. 2021-CA-1411-MR)

We shall next consider Ratliff's appeal from the October 18, 2021, order granting Cody's motion for summary judgment, which was based on the circuit court's finding that there was no genuine issue of material fact as to foreseeability. Ratliff asserted below that Cody was negligent in giving a gun to Timothy when he was intoxicated and in failing to warn Amy. Our standard of review of a summary judgment is set forth above. And in order to establish a negligence claim, a plaintiff must prove: "(1) a duty on the part of the defendant; (2) a breach of that duty; and (3) consequent injury." *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1992). "The absence of proof on any one of the required elements is fatal to a negligence claim." *Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 542 (Ky. App. 2013).

In her brief, Ratliff contends that Cody's admissions in police recordings or in his deposition entitled her to summary judgment and necessitated the denial of Cody's motion. These admissions were that Cody retrieved the gun from a locked box and gave the gun to a felon he knew to be unstable, intoxicated, un-medicated, and angry at Amy. She argues that a person of ordinary prudence would not actively furnish a gun to such an individual. Ratliff noted Cody's argument was that he did not owe a duty to Amy.

Cody, on the other hand, relies upon this Court's opinion in *James v. Wilson*, *supra*, which addressed the issue of duty in the context of a school shooting. In *James*, the appellants argued that a universal duty applied to everyone and that, pursuant to this universal duty, the appellees should be held accountable for their failure to report Michael Carneal's conduct. 95 S.W.3d. at 889. The Court rejected this argument and held that, absent a special relationship and foreseeability of the harm, "[i]t is well settled in Kentucky jurisprudence that there is no legal duty to report the commission of a crime by another, let alone the possibility of a crime being committed by another. Both common law and, as indicated above, statutory law, have consistently upheld this fundamental principle." *Id*. at 889. These special relationships include common carriers, innkeepers, or a person who opens his land to the public. *Id*. at 890.

In the present case, there was no special relationship between Cody and Amy that would trigger any duty on Cody's part to protect or warn her. Nor was there a duty for Cody to control his father. In addition, we agree with the circuit court that there are no disputed facts that Timothy's acts of shooting and killing Amy in her residence were not foreseeable to Cody, despite Ratliff's assertions to the contrary.

> Nearly all human acts, of course, carry some recognizable but remote possibility of harm to another . . . . Those against which the actor is required to take precautions are those which society, in general, considers sufficiently great to demand them. No man can be expected to guard against harm from events which are not reasonably to be anticipated at all, or are so unlikely to occur that the risk, although recognizable, would commonly be disregarded.

*Id*. at 892 (citing *North Hardin Developers, Inc., v. Corkran by Corkran*, 839 S.W.2d 258, 261-62 (Ky. 1992)). We also note Cody's mention in his brief that Ratliff had abandoned the foreseeability argument in her response to KFB's supplemental memorandum in support of its motion for summary judgment below when she stated that Cody could not have foreseen the events that took place that day.

Because Cody did not owe any duty to Amy and because the risk of harm to her was not foreseeable, Ratliff cannot establish her claim of negligence. Therefore, the circuit court properly granted summary judgment in Cody's favor.

Finally, we agree with Cody that any arguments Ratliff makes that her motion for summary judgment should have been granted are not well taken. The circuit court did not rule on Ratliff's motion, limiting the order to granting Cody's motion for summary judgment.

For the foregoing reasons, the orders of the Letcher Circuit Court are affirmed.

ALL CONCUR.


BRIEFS FOR APPELLANTS:

James P. Bowling
Hindman, Kentucky

BRIEF FOR APPELLEE
KENTUCKY FARM BUREAU
MUTUAL INSURANCE CO. (2021-
CA-1410-MR):

Marcia L. Wireman
Jackson, Kentucky

Michael D. Risley
Louisville, Kentucky

BRIEF FOR APPELLEE CODY
SHELBY (2021-CA-1411-MR):

Deborah R. Lewis
Hazard, Kentucky